[Civ. No. 19061. First Dist., Div. One. Sept. 14, 1960.]

NOEL MARTIN, Appellant, v. AMELIE L. SMITH, as City Clerk, etc., et al., Respondents.

*Assigned by Chairman of Judicial Council.

Rockwell, Fulkerson & Wilson for Appellant.

John B. Ehlen and John H. Riordan for Respondents.

BRAY, P. J.—Appellant appeals from a judgment denying his petition for writ of mandate to compel respondent officials of the city of Sausalito to examine, certify and consider a referendum petition protesting the adoption of Resolutions No. 1474 and No. 1475.

### QUESTIONS PRESENTED

1. Are said resolutions legislative in nature and therefore subject to referendum?
2. Are findings necessary?

### RECORD*

The controversy grows out of a lease made by the State Lands Commission in 1951 to Madden and Lewis Company of 9.2 acres (in 1953 increased to 11.22 acres) of filled breakwater or sandspit on submerged land in Richardson Bay, title to which was in the state. The lessee was to use the land for commercial purposes, mainly a yacht harbor and structures and facilities connected thereto. (These were to be somewhat similar to San Francisco's Yacht Harbor and its famous Fisherman's Wharf.) In 1953 (Stats. 1953, ch. 534,

---

*See *Martin* v. *Smith,* 176 Cal.App.2d 115 [1 Cal.Rptr. 307], where we discussed the effect on this proceeding of the passage of another resolution numbered 1485.

p. 1795) the Legislature granted to the city of Sausalito certain tide and submerged lands which included the land above mentioned. The statute provides that the city of Sausalito "may lease said lands, or any part thereof, for limited periods (but in no event exceeding 50 years), for purposes consistent with the trust upon which said lands are held by the State of California, and with the requirements of commerce and navigation at said harbor, and collect and retain rents from such leases, franchises and privileges." The grant recited that it was "[s]ubject to the Madden and Lewis lease." The term of the lease originally was until February 24, 1967, with an option in the lessee to renew for two additional periods of 10 years each. In 1955 the lessee exercised that option and the city extended the lease until 1987. Thereafter Madden and Lewis entered into certain agreements with Clarence C. Kane and Grace Management Corporation providing for a sublease of these and other premises, for the construction of a restaurant and bar, a de luxe motel, a swimming pool, small shops, and a parking area. On November 7, 1956, the council consented to this sublease. December 18, by Resolution No. 1346, the council extended the term of the Madden lease 20 years after February 24, 1987, and included an additional 4.77-acre parcel. The Kane et al. sublease was cancelled. April 7, 1959, Resolution No. 1474 was adopted which approved in principle a proposed sublease from Madden to MacMarin, Inc., final approval reserved until layout of the area as to buildings, landscape, etc., were approved by the city. May 5, 1959, Resolution No. 1475 was adopted. This consented to a sublease from Madden to Mac-Marin, Inc., until 2007. This constituted final approval by the city council of the sublease subject to certain terms and conditions relative to the nature and cost of the improvements to be constructed.

Within 30 days after the adoption of Resolution No. 1475 a referendum petition was filed with the city clerk protesting the adoption of both Resolutions No. 1474 and No. 1475. The city clerk, on the ground that the resolutions are not subject to referendum, refused, and continues to refuse, to examine said petition and to ascertain therefrom whether the requisite number of signatures appear thereon. Petitioner then sought a writ of mandate to compel the city officials to act in the manner required by law in connection with a valid referendum petition. The superior court refused to issue the writ.

1. *Are the Resolutions Legislative or Administrative in Nature?*

█ Acts of a legislative body which are legislative in nature are subject to the referendum process, whereas acts which are administrative in nature are not. █ The difference between the two types of activity is set forth in *McKevitt* v. *City of Sacramento,* 55 Cal.App. 117, 124 [203 P. 132], as follows: "Acts constituting a declaration of public purpose, and making provisions for ways and means of its accomplishment, may be generally classified as calling for the exercise of legislative power. Acts which are to be deemed as acts of administration, and classed among those governmental powers properly assigned to the executive department, are those which are necessary to be done to carry out legislative policies and purposes already declared by the legislative body, or such as are devolved upon it by the organic law of its existence."

McQuillin on Municipal Corporations (3d ed.), volume 5, pages 255-256, states: "Again it has been said: 'The power to be exercised is legislative in its nature if it prescribes a new policy or plan; whereas, it is administrative in its nature if it merely pursues a plan already adopted by the legislative body itself, or some power superior to it.' " (Citing *Seaton* v. *Lackey,* 298 Ky. 188 [182 S.W.2d 336, 339].)

█ Applicable here is the following from *Hopping* v. *Council of City of Richmond* (1915), 170 Cal. 605, 611 [150 P. 977] : "To allow it [referendum] to be invoked to annul or delay executive conduct would destroy the efficiency necessary to the successful administration of the business affairs of a city."

The State Lands Commission's action in granting the lease to Madden and Lewis Company "for lawful commercial purposes," pursuant to the company's application for a lease for such purposes, clearly recognized and declared a policy in favor of the use of the land for private commercial purposes. It seems equally clear that the state Legislature, in granting this land and other tidelands to the city "[s]ubject to the Madden and Lewis lease," clearly confirmed and ratified the action of the State Lands Commission. The policy for the private commercial use of the sandspit has, therefore, both the state's legislative and administrative sanction.

█ The city, in the case at bar, accepted the trust in the tidelands granted by the state. The city council thereby

performed a legislative act, one that fixed the city's policy to administer the trust in accordance with all the obligations attached thereto, including the existing Madden and Lewis Company lease and the right therein specified to use the leasehold "for lawful commercial purposes." It seems obvious that, in administering this trust, the city council was merely carrying out its commitment to fulfill the obligations previously assumed by the trust settlor, the State of California.

The statute granting to the city of Sausalito, in trust, tidelands within its corporate limits, including the "sandspit," sets forth the objects of that trust, and Resolutions No. 1474 and No. 1475 are merely administrative steps toward the carrying out of those objects.

Civil Code, section 718, limits the leases of tidelands and submerged lands granted by the state to a city to a term of 50 years, and includes within the purposes of such leases not only harbor development but "any other public use or purpose consistent with the requirements of commerce or navigation at, or in, any such harbor or harbors."

Government Code, section 37386, provides: "A city may lease such tide and submerged lands and uplands for: (a) Industrial uses. (b) Improvement and development of city harbors. (c) Construction and maintenance of wharves, docks, piers, or bulkhead piers. (d) Other public uses consistent with the requirements of commerce or navigation in city harbors."

■■■ Action by the city was necessary, for paragraph 6 of the lease between the state and Madden and Lewis Company provides: "That the Lessee shall not transfer nor assign this agreement and shall not sublet said land nor any part thereof, except upon the prior written consent of the State first had and obtained; . . ." The city as successor in interest of the state had to approve the sublease from Madden and Lewis to MacMarin.

The action by the city council was administrative rather than legislative in nature. When Madden and Lewis Company applied for the lease in question they made quite clear the purposes for which the land would be used. ■■■ The state in granting the lease specified the uses to be "for lawful commercial purposes, the construction, maintenance and use of a yacht harbor and structures and facilities connected thereto." Commercial is an encompassing term, relating to all business, and its use in the lease would seem to indicate the state's intention that business should be carried on on the leased property. To ascribe to the term "for lawful com-

mercial purposes'' any other interpretation would be to label the Legislature's insertion of the phrase an idle act.

Appellant concedes that insofar as the council was merely approving a sublease under the Madden and Lewis lease as to purposes covered by that lease, the council was acting only in an administrative capacity. However, he contends that the purposes expressed in the Madden and Lewis lease for which the leased premises could be used ''for lawful commercial purposes, the construction, maintenance and use of a yacht harbor and structures and facilities connected thereto,'' did not include such commercial purposes as ''a first-class restaurant, with a cocktail lounge, and, thereafter, small shops, and other improvements as it [MacMarin, Inc.] shall determine, designed to develop the subleased area to its best available use, including the catering to, and serving, yachtsmen, boat owners and others using the waters adjacent thereto,'' which are set out in the resolutions and in the sublease, and therefore in granting the sublessee those excess purposes the council was acting legislatively. (Incidentally, the general layout, design and location of the permitted structures and improvements, requiring a certain parking area and access to the shore of said premises as shown on a certain photograph, are required to be followed by the resolutions and the sublease.)

In construing the purposes for which the premises may be used under the Madden and Lewis lease, the application to the State Lands Commission for such lease is relevant. That application stated that Madden and Lewis desired to construct on the ''sandspit'' facilities similar to those at San Francisco's Yacht Harbor and at Fisherman's Wharf, which would include in addition to the then existing yacht harbor which would be improved, ''accommodations for the serving and sale of sea food and meals . . . an oil and gas station . . . a parking space for automobiles, and various additional facilities for the berthing of boats, yachts and small craft, and other facilities for the accommodation of such craft and their owners.''

To adopt appellant's interpretation of the purposes set forth in the original lease would require the complete elimination therefrom of the words ''for lawful commercial purposes.''

It is clear that the term ''commercial purposes'' in the original lease covered more than strictly a yacht harbor, although today the facilities of yacht harbors generally include

such facilities as restaurants and cocktail lounges. The resolution and sublease require that the sublessee must maintain the physical integrity and structure of the sandspit which served as a breakwater to protect small craft.

Section 6501.1 of the Public Resources Code provides that the State Lands Commission may lease state lands under its jurisdiction ''for such purpose or purposes as the commission deems advisable, including but not limited to grazing leases, leases for commercial or industrial purposes, . . .'' In making the lease the State Lands Commission knew the purposes for which Madden and Lewis intended to use the land, and in granting the lease construed such purposes to be within the power given it in section 6501.1 to lease for ''commercial'' purposes and such purposes are consistent with the trust upon which said lands were conveyed to the city, and with the requirements of commerce and navigation of said harbor.

The term ''commercial purposes'' in the master lease must be interpreted in view of the holding in *San Pedro etc. R. R. Co.* v. *Hamilton* (1911), 161 Cal. 610 [119 P. 1073, 37 L.R.A. N.S. 686] : ''The purpose of the constitutional provision [Const., art. XV, § 3, dealing with tidelands] was not to blight commercial enterprise, but to foster it.'' (P. 620.)

The council was merely implementing the policies declared by the state in the lease and reaffirmed in the grant to the city, which was given subject to the lease. These acts were administrative in nature and not subject to referendum.

### 2. *Findings.*

Appellant contends that the judgment is void because of the absence of findings, on what he contends are controverted questions of fact. The pleadings concede the legislative conveyances by the state to the city, the state lease, the acceptance of the state lease by the city and the adoption of the resolution. The only dispute of fact relates to certain allegations in appellant's petition as to the present and proposed uses of the land, which allegations respondents' answer controverts. The sole legal question presented was whether or not referendum would lie as to the resolution. This question would not be affected by the determination of whether appellant's statement of the uses to which the land would be put, or that of respondents, was correct. However, this proceeding was heard and determined on oral argument alone, and judgment was rendered without the taking of any evidence. The court determined the matter as an issue of law

alone. In his closing brief appellant states that the matter was heard and determined as an issue of law, "the issue being whether the facts set forth in Appellant's Petition entitled Appellant to the relief sought." Under well-established rules, no findings are required where the judgment is based solely on an issue, or issues, of law. (*Wheeler* v. *Board of Medical Examiners* (1929), 98 Cal.App. 267, 268 [276 P. 119]; see also *Delany* v. *Toomey* (1952), 111 Cal.App.2d 570, 572 [245 P.2d 26].)

In view of our decision that Resolutions No. 1474 and No. 1475 were administrative in nature, we deem it unnecessary to discuss the contention made by respondents that the leasing of tidelands is not a municipal affair.

The judgment is affirmed.

Tobriner, J., and Duniway, J., concurred.