[Civ. No. 20392. First Dist., Div. One. Dec. 11, 1962.]

RUSSELL S. REAGAN, Plaintiff and Respondent, v. CITY OF SAUSALITO et al., Defendants and Appellants.

John B. Ehlen for Defendants and Appellants.

Knox, Hawkins & Pierce and Herbert G. Hawkins for Plaintiff and Respondent.

BRAY, P. J.—Respondents-appellants City of Sausalito and certain officers thereof[1] appeal from an order for peremptory writ of mandate.

---

[1] They will be referred to herein collectively as "the city."

QUESTIONS PRESENTED

(1) May referendum be invoked against resolution 1571, providing for the acquisition by the city of certain property for aquatic park and playground purposes? This question turns on (a) whether said resolution constitutes a legislative or an administrative act; (b) whether the power to determine the necessity and advisability of purchasing land for the public parks has been delegated to the city council exclusively.

(2) Were the referendum proceedings premature?

(3) Is resolution 1571 void because adopted within one year of repeal of resolutions 1540 and 1542?

RECORD

The facts are not in dispute. December 6, 1960, the City of Sausalito adopted resolution 1571: "RESOLVED, that the City Council of the City of Sausalito do, and it does hereby, re-affirm and redeclare the firm purpose, policy and program of said City and said City Council to acquire out of said City's annual revenues those certain water-front properties commonly known and described as the 'Shelter Cove,' and officially described as Blocks C and F, as shown on the recorded map of the Sausalito Bay Land Company, for acquatic [sic] park, playground, open space and public ground purposes."

A referendum petition was filed with the city clerk by petitioner-respondent Reagan, a taxpayer,[2] demanding that the city council reconsider the adoption of said resolution and either repeal it or submit it to the voters in an election. On advice of the city attorney that the resolution constituted merely an administrative act and therefore was not subject to referendum, the council denied the petition. Thereupon petitioner brought this proceeding in mandate. The trial court, after a hearing, ordered the issuance of a writ of mandate commanding the council to reconsider the resolution and either entirely repeal it or submit it to the voters.

1. (a) *Legislative or Administrative?*

 The power of referendum may be invoked only with respect to measures that are strictly legislative in character. *(Johnston* v. *City of Claremont* (1958) 49 Cal.2d 826, 834 [323 P.2d 71]; *Hopping* v. *Council of City of Richmond* (1915) 170 Cal. 605, 611 [150 P. 977].) "Acts constituting a declaration of public purpose, and making pro-

---

[2]Hereinafter referred to as "petitioner."

vision for ways and means of its accomplishment, may be generally classified as calling for the exercise of legislative power. Acts which are to be deemed as acts of administration, and classed among those governmental powers properly assigned to the executive department, are those which are necessary to be done to carry out legislative policies and purposes already declared by the legislative body, or such as are devolved upon it by the organic law of its existence." *(McKevitt* v. *City of Sacramento* (1921) 55 Cal.App. 117, 124 [203 P. 132] ; see also *Martin* v. *Smith* (1960) 184 Cal. App.2d 571, 575 [7 Cal.Rptr. 725] ; 3 Stan. L. Rev. 497, 502- 504 (1951) ; 5 McQuillin, Municipal Corporations (3d ed.) pp. 253-256, § 16.55.)

 The city contended that the legislative policy was laid down at some time prior to the adoption of resolution 1571 and that the latter is merely a reaffirmation of the city's previously established policy to acquire Shelter Cove, and that therefore in this resolution the council was only exercising an administrative act in purchasing the property to carry out the policy. Unfortunately, as will hereinafter appear, the record discloses no resolution purporting to establish such policy, other than two which were repealed. The trial court so found.

The resolutions on which the city relies are 1540, adopted June 24, 1960; 1542, adopted July 5, 1960; 1554, adopted September 6, 1960; and 1558, adopted October 18, 1960.

Resolution 1540 noted the policy of the city for the past 20 years of improvement, protection and maintenance of the city's scenic beauty. It then resolved that the city purchase Shelter Cove upon certain terms and conditions. Resolution 1542 approved a form of contract to be executed by the city with the owner for the purchase of the property. July 22, 1960, a referendum petition protesting the adoption of resolutions 1540 and 1542 was filed with the council. The council tabled it on the ground that the resolutions were not subject to referendum. Petitioner herein then filed a mandate proceeding in the superior court to obtain the repeal of the two resolutions. While that action was pending and on December 6, 1960, the day when resolution 1571 (the one in dispute) was adopted, resolution 1570 was adopted. *It repealed both resolutions 1540 and 1542.* The reason given for the repeal was that prior to their adoption the city had failed to submit the matter of the acquisition by the city of said Shelter Cove to the planning commission, as required by law.

Resolution 1554 authorized the acquisition of certain real property adjacent to Shelter Cove, but not included therein, and declared that the acquisition of the property was in accord with the city's long established policy and program of acquisition of property along the waterfront including lands lying southerly of said real property (Shelter Cove lies southerly thereof) for the purpose of maintaining scenic beauty. Resolution 1558 authorized the employment of an appraiser to determine the true market value of the property described in resolution 1554 (not Shelter Cove). The resolution also declared that the acquisition of the land therein described was "in accord with a long and firmly established plan, program and policy to acquire, for the uses and purposes specified in . . . [1554] and out of the City's ordinary annual income, properties for the improvement of the City's waterfront in such a manner and to such an extent as shall be compatible with the protection and preservation of the City's scenic beauty and marine view over the waters of the San Francisco Bay, including the lands commonly known and described as the Shelter Cove."

The trial court found that the recitals in resolutions 1554 and 1558 did not of themselves establish a plan, policy or program to buy Shelter Cove as described in resolution 1571 and that a referendum as to resolutions 1554 and 1558 or either would not have placed before the electorate the propriety of the purchase of Shelter Cove as proposed in resolution 1571. The court further found resolution 1571 to be a legislative act subject to referendum. It further found that the referendum petition is a valid one.[3]

As resolutions 1540 and 1542 were rescinded, they cannot be considered as ones which carry out "legislative policies and purposes already declared . . ." (McKevitt v. City of Sacramento, supra, 55 Cal.App. at p. 124.) The effect of the rescinding is the same as was said concerning the repeal of an ordinance in Spears v. County of Modoc (1894) 101 Cal. 303 [35 P. 869], quoting from Kay v. Goodwin, 6 Bing. 576, 4 Moore & P. 341, where a municipal ordinance was repealed pending an appeal from a judgment imposing a fine for violation of the ordinance. The court said that the effect of the repeal was " 'to obliterate it as completely from the records of the .. . [council] as if it had never passed . . .' " (P. 305.)

---

[3]No contention is made that the referendum proceedings, if applicable, were not properly conducted.

The only resolutions prior to 1571 before the trial court which referred to Shelter Cove, other than the rescinded resolutions, are resolution 1558, which authorized the employment of an appraiser to appraise, not Shelter Cove, but property adjacent to it, and resolution 1554, which obliquely referred to a claimed past policy to acquire waterfront lands in general. The appointing of an appraiser could hardly be called a legislative act, nor could the mention therein or in resolution 1554 of a claimed preexisting policy constitute a legislative act. The city concedes that this was not such. As found by the trial court such resolutions could not be subject to referendum.

Thus, the record discloses no action or declaration of policy in existence at the time of the adoption of resolution 1571, which could be held to be a legislative act relating to the policy of purchasing Shelter Cove. The declaration of policy in resolution 1571, upon which the determination to purchase Shelter Cove is based, is a legislative act and therefore the resolution is subject to referendum.

(b) *Power to Purchase Land for Parks.*

The city contends additionally that resolution 1571 is not subject to referendum because the power to determine the necessity and advisability of acquiring lands for public parks has been delegated to the city council and not to the people.

It is the city's theory that the providing of parks and playgrounds in a municipality are matters of statewide interest and not matters of municipal concern, and that the Legislature has so decreed, in effect, by the enactment of the following statutes: Section 5303, Public Resources Code, provides that "The legislative body of any city" may by ordinance or other legislative act "determine what lands are necessary and proper to be acquired for public parks . . ." Section 40401, Government Code, provides that "the legislative body" may "[i]n its discretion" acquire land for "squares, parks, playgrounds, and places within the city and improve, equip, and maintain them."

The mere granting by the Legislature to the legislative body of a city of the discretionary power to determine what lands should be acquired for park purposes does not, and could not, prevent the application of the right of referendum, which is provided by the Constitution, as to legislative acts of a city's legislative body. It is only in matters of statewide concern that the Legislature can be held to delegate

such a particular authority to the governing board as to prevent the application of the referendum process. See *Mervynne* v. *Acker* (1961) 189 Cal.App.2d 558, 562 [11 Cal.Rptr. 340].)

In *Mefford* v. *City of Tulare* (1951) 102 Cal.App.2d 919 [223 P.2d 847], it was contended that the people of that city had no power to enact an initiative ordinance requiring subdividers to furnish a profile map of their subdivisions showing certain required matters, as the ordinance was claimed to be contrary to the Subdivision Map Act (Bus. & Prof. Code §§ 11500-11628.) The court stated that it had examined the various provisions of that act and could find no limitation therein of the power of the electorate to enact the ordinance. Section 11525 of that act provided, ''Control of the design and improvement of subdivisions is vested in the governing bodies of cities . . .'' If the city's contention that the vesting of power to perform a certain legislative act in the governing body of a municipality barred the use of referendum to such act, then (as initiative and referendum are equal in the respects here considered) the court in *Mefford* would have been compelled to hold that the ordinance there considered could not be enacted by initiative. Yet, the court held that it could be so enacted.

Nor could the grant contained in sections 5303 and 40401, *supra,* be construed as a determination that the acquisition of parks by a city is a matter of statewide concern. Neither in those statutes nor otherwise, has the Legislature purported to preempt the field by any state regulations concerning municipal parks. Moreover, it has been determined that the establishment of public parks in a city is a municipal affair. In *Mallon* v. *City of Long Beach* (1955) 44 Cal.2d 199 [282 P.2d 481], the City of Long Beach intended to appropriate and expend for general municipal purposes the income derived from the sale of oil and gas produced from the tide and submerged lands granted Long Beach by the State of California. The court held that the state granted the lands in trust for the development of the state's harbors, and that the use of the moneys derived from such lands for municipal purposes was improper as the moneys were state funds. It then pointed out what it considered as matters of municipal concern for which state moneys could not be expended, included in which were ''public parks.''

In construing the Municipal Bond Act of 1901, in *City of Oakland* v. *Thompson* (1907) 151 Cal. 572, 575 [91 P. 387],

the court stated: ''It will not be questioned but that the acquisition of parks is, without any express words of authorization, included whenever a grant of power is conferred to acquire property for 'municipal purposes.' [Citations.]''

*Hopping* v. *Council of City of Richmond, supra,* 170 Cal. 605, held that a resolution of the city determining that the public interest of the city required that it should have a city hall, that it should be located on land offered for that purpose, and that the offer should be accepted, was a declaration of a public purpose and a provision for ways and means of its accomplishment and constituted legislative acts subject to referendum. *Hill* v. *Board of Supervisors* (1917) 176 Cal. 84 [167 P. 514], held that a resolution of a county board of supervisors declaring the necessity for and authorizing the construction of a hall of records, and accepting plans and specifications for the erection of the same, was legislative in character and subject to referendum. *Burdick* v. *City of San Diego* (1938) 29 Cal.App.2d 565 [84 P.2d 1064], held that a resolution selecting, designating and accepting a site for a police station was a legislative act subject to referendum but that a later resolution calling for bids for the construction thereof was not and was not subject to referendum. *Beard* v. *City & County of San Francisco* (1947) 79 Cal.App.2d 753, 755 [180 P.2d 774], held that the establishment and operation of a city hospital is a municipal affair. *Larsen* v. *City & County of San Francisco* (1957) 152 Cal.App.2d 355, 366 [313 P.2d 959], held offstreet parking facilities to be ''purely a municipal affair.'' ██ The city's suggestion in our case that people from outside a city use its parks would apply to a city's offstreet parking facilities as well. The fact of such use does not make the acquisition and operation of those facilities a matter of statewide concern. *Simpson* v. *Hite* (1950) 36 Cal.2d 125 [222 P.2d 225], dealt with resolutions of the board of supervisors designating and acquiring a site for buildings to house municipal and superior courts. The court held that the state Legislature requiring the counties to provide buildings to house courts had declared the applicable legislative policy and therefore the act of providing a site and the construction of court buildings thereon was merely an administrative act carrying out that policy and hence the resolutions were not subject to referendum. The court distinguished *Hopping, Hill* and *Burdick, supra,* on the ground that ''in none of those cases was the court purporting to deal with a situation such as the one at bar, where the legislative

policy has been expressly fixed by the state itself, and the execution of that policy has been specifically imposed by the state law on the board of supervisors as an administrative function." (P. 131.)

The city relies on *Alexander* v. *Mitchell* (1953) 119 Cal. App.2d 816 [260 P.2d 261], which involved a proposed Palo Alto initiative ordinance—"An Ordinance to Protect Referendum Rights and Prohibit Eminent Domain in Parking Lot Proceedings," which provided that offstreet parking might not be accomplished by district proceedings, or if so done, the proceedings would be subject to referendum; that eminent domain proceedings could not be applied to the acquisition of offstreet parking sites, except in a limited situation. It purported to repeal all proceedings of the council concerning offstreet parking theretofore had. This court there held that the right of eminent domain is a matter of statewide concern and could not be abrogated by the people of a municipality, and that the right of the city council to determine the necessity for construction of public improvements by the district assessment plan had been granted to the city council by the people of the state and could not be taken away. We also held that referendum would lie only as to matters of municipal concern, and that the projects in question were local in character, because only money from the assessment districts, and not the general fund nor a general tax, was to be used to pay for the improvements. The city contends that because we held in *Alexander* that the right of eminent domain is a matter of statewide concern, and *City of Los Angeles* v. *Koyer* (1920) 48 Cal.App. 720, 726 [192 P. 301], held "the exercise of the power of eminent domain for any purpose is not to be classed as a municipal affair"[4] and because the city has the power under eminent domain to condemn lands for park purposes, it is unreasonable to hold that referendum will lie as to a resolution for the acquisition of property which could be acquired by eminent domain, even though the resolution does not provide that it will be so acquired.

▮▮▮ Merely because the power of eminent domain might be involved, does not make the purchase of a park site by a city a matter of statewide concern, and hence no longer a municipal matter. In *Alexander* the attempt made was to completely abrogate the power of eminent domain, an entirely different matter from that with which we are here concerned.

---

[4]This case had nothing to do with referendum.

The city has pointed to no case holding that merely because the acquisition of property by a municipality may be by eminent domain as well as by purchase, referendum will not lie to a legislative act providing for the property's acquisition. Under such a theory, the resolutions providing for acquisition of a city hall site in *Hopping, supra,* a hall of records site in *Hill, supra,* a police station site in *Burdick, supra,* an offstreet parking lot in *Alexander, supra,* would not have been subject to referendum because the properties involved might have had to be acquired through eminent domain. There is no basis for such a theory.

By analogy, the acquisition of land for park purposes is as much a municipal affair as were the purposes set forth in the hereinbefore discussed cases. Actually the factual pattern is the same in all instances. They are all municipal affairs and of citywide interest, as the payment therefor comes out of the city's annual revenue.

Cases cited by the city holding traffic matters in a municipality to be of statewide concern are not persuasive to show that the acquisition of parks by the city is a matter of statewide concern. Nor is the Oregon case of *Monahan* v. *Funk* (1931) 137 Ore. 580 [3 P.2d 778], holding that an ordinance to purchase land for a garbage crematory passed pursuant to an amendment to the city charter is not subject to referendum, in point. In Oregon to be subject to referendum an ordinance must be one which ''relate[s] to subjects of a permanent or general character'' (p. 779) and which ''prescribes a rule of civil conduct'' and is ''universal in its application to the general public.'' (P. 780.) California has no such requirement.

It should be noted that statutory provisions dealing with the constitutional power of referendum should be liberally construed in favor of the power. *(Alexander, supra,* p. 821; *Dye* v. *Council of City of Compton* (1947) 80 Cal.App. 2d 486, 491 [182 P.2d 623].)

### 2. *Was the Referendum Premature?*

The city rather inconsistently contends that the referendum proceedings were premature for the reason that resolution 1571 did not provide ways and means for the implementation of the policy declaration. This contention is entirely inconsistent with the city's prior contention that the referendum was, in effect, too late, because, as only legislative acts are subject to referendum, the city contended that there had been such a prior legislative act. Actually, resolution

1571 does declare ways and means, namely, that Shelter Cove is to be acquired out of annual city revenues. If, as urged by the city, referendum proceedings had to be delayed until the terms, conditions and method of acquisition were stated, such resolution following one declaring policy would probably be an administrative act against which referendum would not lie. It is the declaration of policy which is legislative, and concerning which a referendum must be filed. (See *Simpson* v. *Hite, supra,* 36 Cal.2d at pp. 130-131.)

3. *Resolution 1571 Not Void.*

The city contends that resolution 1571 is void because adopted within one year of the repeal of resolutions 1540 and 1542, against which a petition for referendum had been presented.

Section 4052, Elections Code, provides, where a referendum petition is filed against an ordinance, "If the legislative body repeals the ordinance or submits the ordinance to the voters" and the ordinance does not carry, *"the ordinance shall not again be enacted* by the legislative body for a period of one year . . ." (Emphasis added.)

Resolution 1570 rescinding resolutions 1540 and 1542, gave as reason therefor that the matter had not first been submitted to the planning commission. Section 65551, Government Code, provides that a city which has adopted a master plan (Sausalito has) shall not acquire land for a park or other public ground until its location, purpose and extent have been submitted to and reported upon by the planning commission. This was not done. The city contends that therefore the resolutions were void, and hence there was a valid reason unconnected with the referendum filed against them, to repeal them. The city then says that resolution 1571 is essentially the same as resolution 1540 and having been enacted within one year of the repeal of the latter is void, and referendum will not lie against resolution 1571 because void measures are not subject to referendum. (5 McQuillin, Municipal Corporations (3d ed.) § 16.54, p. 252; see also *Myers* v. *Stringham* (1925) 195 Cal. 672 [235 P. 448] ; *Hurst* v. *City of Burlingame* (1929) 207 Cal. 134 [277 P. 308].)

We deem it unnecessary to determine whether the one year inhibition in section 4052 applies where the council states a valid reason for rescinding the attacked resolution rather than merely the reason that a referendum petition has been filed against it, for the reason that section 4052 does

not apply in any event unless the second enactment is essentially the same as the prior one. *(Martin* v. *Smith* (1959) 176 Cal.App.2d 115, 118 [1 Cal.Rptr. 307]; see also *Gilbert* v. *Ashley* (1949) 93 Cal.App.2d 414 [209 P.2d 50].)

Resolution 1540 after referring to a long existing policy of protecting the city's scenic beauty and improving its "unexcelled marine view" states that Sausalito Foundation, a nonprofit private corporation, has prepared to undertake the acquisition of Shelter Cove, and after it acquires title thereto the city will purchase the property in the manner and for the amounts set forth. The city further agrees to lease to the foundation for a term of 50 years, subject to termination after 29-1/2 years, a certain portion of the property for waterfront recreational uses. No rental shall be required, except that two-thirds of any net income derived from the leased premises shall be paid to the city. Resolution 1542 approves the form of contract between the city and Sausalito Foundation. Resolution 1571 eliminates all mention of Sausalito Foundation and of any lease to it and is limited to a declaration of a policy of the city to "acquire out of said City's annual revenues" Shelter Cove.

The first two resolutions tie the matter of purchasing Shelter Cove to the leasing of a portion of it on a rent-free basis. Neither resolution 1540 nor 1542 makes any reference to the proposed purchase of Shelter Cove being "for acquatic [*sic*] park, playground, open space and public ground purposes," as does resolution 1571. Resolution 1540 gives as the purpose of the purchase, if it can be held to state a purpose, the protection of the city's scenic beauty and the maintenance of the marine view, plus the use of a portion of the property by the foundation for recreational purposes on a rent-free basis. Resolution 1571 is limited to establishing the policy of acquiring Shelter Cove for park, etc. purposes. Thus, a comparison of resolutions 1540 and 1542 with resolution 1571 shows them to be substantially dissimilar. As said in *Gilbert* v. *Ashley, supra,* 93 Cal.App.2d 414, 415-416: " 'The council may, however, deal further with the subject matter of the suspended ordinance, by enacting an ordinance essentially different from the ordinance protested against, avoiding, perhaps, the objections made to the first ordinance. If this be done, not in bad faith, and not with intent to evade the effect of the referendum petition, the second ordinance should not be held invalid for this cause,'

"The existence of bad faith on the part of the members of the city council can only be determined from the language of the ordinance, as there can be no intent in a statute not expressed in its words, and there can be no intent upon the part of the framers of such a statute which does not find expression in their words." (See also *Martin* v. *Smith, supra,* 176 Cal.App.2d 115, 121.)

We find nothing in the language of resolution 1571 establishing bad faith, and as said in *Gilbert, supra,* page 416, "every presumption is in favor of its validity."

The order is affirmed.

Sullivan, J., and Molinari, J., concurred.