[Civ. No. 1839. Fifth Dist. Nov. 8, 1972.]

DAVID O. DURAN et al., Petitioners, v.
RAY A. CASSIDY, as City Clerk, etc., Respondent.

COUNSEL

Kenneth E. Conn for Petitioners.

Richard B. Isham, City Attorney, for Respondent.

## OPINION

FRANSON, J.*—The dispute centers around the question whether the Plaza Regional Park (sometimes referred to as Visalia Air Park) in the City of Visalia, hereinafter referred to as "city," should have an 18-hole golf course. The park encompasses approximately 240 acres of land situ-

---

*Assigned by the Chairman of the Judicial Council.

ated adjacent to the Visalia Airport. The golf course, club house and driving range will take up about 150 acres of the park area.

From a meager record, we have educed the following: For many years the city has contemplated the development of the land to a multiple use regional park. On September 29, 1966, the city council, by resolution, authorized its public service director to apply to the state under the 1964 State Beach, Park, Recreational, and Historical Facilities Bond Act (Pub. Resources Code, § 5096.1 et seq.) for a grant of money with which to develop the park. The written application, dated September 28, 1966, and approved by the city council on September 29, 1966, asked for a grant of $100,000 and specified golf as a proposed use along with other activities.[1] On October 4, 1966, the Tulare County Board of Supervisors, after reviewing the plans for the park and the city's application for state money, approved the plans and the city's application. The board's approval was apparently necessitated by the fact that the land was located in the unincorporated area of the county, outside of the city limits. On October 26, 1966, the county planning commission, following a staff recommendation that the park should be shown on the county's general plan map and included within the text of the general plan where necessary, recommended an amendment to the general plan (previously adopted by the county in 1964) to include the park as a recreation element. On November 22, 1966, the board of supervisors formally amended the general plan by including the park as a recreation element therein.

The record is silent as to events after November 22, 1966, until August 10, 1967, when the city council authorized its director of public works to execute an agreement with the state for a grant for the park project. Following the execution of the agreement with the state, annexation procedures were commenced, and on December 20, 1967, the city annexed the park land.

The record is again silent as to events which transpired, until November 15, 1971, when the city council approved the following recommendations of its deputy city manager regarding the park:

"1. Council approve Park/Airport master plan.

---

[1]It should be noted that the council resolution of September 29, 1966, makes no mention of a golf course and merely authorizes an application to the state for moneys to develop a park. The application, which appears not to be a matter of public notice, specifies as proposed uses and facilities of the park "riding trails, rodeo grounds, stables, pistol, skeet and archery ranges, golf, general picnic areas, athletic fields, roadside rests, swimming."

2. Council establish Project 71-42 and transfer $200,200.00 City funds to construction account.

3. Staff be authorized to accept $22,500 Federal Land and Water Conservation funds and place in Project 71-42 construction account.

4. Staff be authorized to draw from the State Recreation Bond Act the remainder of the City's $100,000 and place in Project 71-42 construction account.

5. Council approve use of city staff and equipment for construction of Regional Park together with such contractors as necessary."

Following the action of the city council on November 15, 1971, the city commenced construction of the golf course.

Petitioners allege that they are qualified registered electors of the city; that on January 18, 1972, pursuant to the provisions of section 4001 et seq., of the Elections Code of California, they caused to be published a notice of intent to circulate an initiative petition to bar the city from owning and operating a golf course at the park. The petition, addressed to the city council, requested that the proposed ordinance (in the form of a resolution attached to the petition) be passed by the council or be submitted immediately to a vote of the people at a special election. The determinative portion of the resolution provides ". . . be it resolved that the City of Visalia cannot own or operate a golf course at the Plaza Regional Park."[2]

Petitioners allege that the original and additional sections of the initiative petition, in aggregate, contain the signatures of more than 1,500 registered voters of the city and constitute more than 15 percent of the total registered voters of the city; that on March 10, 1972, the petition was presented to respondent for processing and filing as required by the Elections Code of California, and that he refused to accept the petition.

On March 24, 1972, petitioners filed a petition for writ of mandate in the Superior Court of Tulare County, seeking an order commanding respondent to perform his duties as required by law. On July 24, 1972, a judgment was entered by the superior court, denying a peremptory writ. On August 2, 1972, a petition for writ of mandate was filed in this court.

A threshold question is whether this court should entertain the petition for an extraordinary writ, having in mind that petitioners, at the time of

---

[2] A copy of the full resolution is attached as Exhibit 1 to this opinion.

filing their petition in this court, had a remedy by way of appeal from the judgment entered by the superior court. ■ Whether an appeal would be an adequate remedy is a question committed to the sound discretion of this court. (*Bruce* v. *Gregory,* 65 Cal.2d 666, 671 [56 Cal.Rptr. 265, 423 P.2d 193]; *Bayless* v. *Limber,* 26 Cal.App.3d 463, 466 [102 Cal.Rptr. 647].) ■ Since construction of the golf course has commenced (the extent of which is not shown in the record) and may be completed before an appeal can be heard, and because of the importance of having a prompt determination of the right of the people to vote on the initiative measure, assuming that the petition meets the legal requirements precedent to placing it on the ballot, we hold that petitioners' remedy by appeal is inadequate and that the petition for mandate to this court is appropriate. (Code Civ. Proc., § 1086; *Farley* v. *Healey,* 67 Cal.2d 325, 327 [62 Cal.Rptr. 26, 431 P.2d 650]; *Blotter* v. *Farrell,* 42 Cal.2d 804, 812-813 [270 P.2d 481]; *Bayless* v. *Limber, supra,* 26 Cal.App.3d at p. 466.)

■ Respondent's duties with reference to the initiative petition appear to be purely ministerial and involve no discretion on his part.

Article VI, section 1, of the city charter (1969 charter, approved by electors of city at special municipal election on April 14, 1969) provides in part: "The legislative power of the City of Visalia shall be vested in the people through the initiative and referendum, and in a body to be designated The Council."

Article XV, section 1, of the charter provides: "Except insofar as is otherwise provided by ordinances hereinafter enacted, the provisions of the Elections Code of the State of California, as the same now exist or may hereafter be amended, governing the initiative, the referendum and the recall of municipal officers shall apply to the use thereof in the City insofar as the same are not in conflict with this Charter."

No ordinance has been cited to us which pertains to the initiative power of the people; hence, the provisions of the Elections Code govern.[3] The code sets forth a detailed procedure for processing initiative petitions. The clerk is required to count the number of signatures on the petition, to ascertain from the records of registration whether the petition has been signed by the requisite number of voters, and to certify the results of his examination to the city council at the next regular meeting. If there are insufficient valid signatures on the petition, a supplementary petition bearing new signatures may be filed within 30 days by the proponents. If the petition contains a sufficient number of valid signatures to qualify, then

---

[3]See Elections Code sections 4008, 4009, 4009.1, 4009.2 and 4011.

the council shall either adopt the ordinance without alteration or immediately order a special election thereon to be held not less than 60 nor more than 75 days thereafter.

In *Farley* v. *Healey* (1967) 67 Cal.2d 325, at page 327 [62 Cal.Rptr. 26, 431 P.2d 650], it is stated: ". . . the acting registrar of voters exceeded his authority in undertaking to determine whether the proposed initiative was within the power of the electorate to adopt. . . . It is not his function to determine whether a proposed initiative will be valid if enacted or whether a proposed declaration of policy is one to which the initiative may apply. These questions may involve difficult legal issues that only a court can determine. The right to propose initiative measures cannot properly be impeded by a decision of a ministerial officer, even if supported by the advice of the city attorney, that the subject is not appropriate for submission to the voters."

In *Gayle* v. *Hamm* (1972) 25 Cal.App.3d 250, at page 255 [101 Cal. Rptr. 628], it is stated: "We learn from *Farley* and *McFadden* [*McFadden* v. *Jordan,* 32 Cal.2d 330 (196 P.2d 787)] that: (1) the county clerk's duty in processing the petition for the requisite number of signatures is ministerial, and (2) the court will not interfere with the reserved right of the people to propose legislation absent a 'compelling showing,' i.e., a showing that it is 'clear beyond question' that the proposed ordinance would be invalid even if enacted. In elucidation of the meaning of 'a compelling showing,' the court in *Farley* stated that such a showing has been made in *Riedman* v. *Brison* (1933) 217 Cal. 383 [18 P.2d 947] and *Mervynne* v. *Acker* (1961) 189 Cal.App.2d 558 [11 Cal.Rptr. 340]. An examination of those two cases shows that determinations of the focal issues necessary to a disposition of those cases had been made previously upon more than one occasion by the Supreme Court. Consequently, the courts considering the petitions for mandamus were able to make the determination that the proposed measure was clearly invalid beyond question, readily and with confidence."

Under the law above cited, we have no alternative but to command respondent to accept the petition and to perform his duties in connection therewith unless we find that, beyond question, the proposed ordinance is invalid. For the reasons hereinafter stated, we cannot so find.

A basic question in the analysis of the validity of the proposed ordinance is whether the council's decision to own and operate a golf course at the Plaza Regional Park was legislative or administrative in nature. ■ If legislative, then it is subject to the initiative and referendum; if administrative, it is not so subject. (*Johnston* v. *City of Claremont,* 49 Cal.2d 826,

834 [323 P.2d 71]; *Housing Authority* v. *Superior Court,* 35 Cal.2d 550, 557 [219 P.2d 457]; *Mueller* v. *Brown,* 221 Cal.App.2d 319, 325 [34 Cal.Rptr. 474]; *Hughes* v. *Lincoln,* 232 Cal.App.2d 741 [43 Cal.Rptr. 306].) This rule is based on the premise that to allow the initiative or referendum to be invoked to annul or delay executive or administrative conduct would destroy the efficiency necessary to the successful administration of a city's business affairs. (*Martin* v. *Smith,* 184 Cal.App.2d 571 [7 Cal.Rptr. 725].)

The amorphous distinction has been described as follows: " 'Acts constituting a declaration of public purpose, and making provision for ways and means of its accomplishment, may be generally classified as calling for the exercise of legislative power. Acts . . . of administration, and classed among those governmental powers properly assigned to the executive department, are those which are necessary to be done to carry out the legislative policies and purposes already declared by the legislative body, . . .' " (*Reagan* v. *City of Sausalito,* 210 Cal.App.2d 618, 621-622 [26 Cal.Rptr. 775].) (*Martin* v. *Smith, supra,* 184 Cal.App.2d 571, 575; Comment, *Limitations on Initiative and Referendum* (1951) 3 Stan.L.Rev. 497, 502-504; 5 McQuillin, Municipal Corporations (3d ed.) pp. 211-215, § 16.55.)

Respondent appears to argue that the council's decision to develop a park at the airport was a legislative declaration of policy and that the decision to include a golf course was simply in furtherance of such policy, hence administrative and not subject to the initiative process. What respondent is saying is that while the people can reverse the council's decision to build a park at the airport, they have no say with regard to the golf course. We cannot agree with this assertion. First, the proposed golf course appears to be the only municipally owned golf course in the city, and the question as to whether the city should enter into the golf course business, necessarily in competition with privately owned clubs in the area, is a policy decision. As stated in the "notice of intent to circulate the initiative petition," published on January 18, 1972, municipal golf courses have been known to lose money. Whether city money should be invested in this type of business venture is a matter of legitimate concern to the people. Obviously, a golf course is not essential to a public park, and it can be judicially noticed that most city parks do not include a golf course. Second, the golf course appears to be the quintessence of the park. It encompasses approximately two-thirds of the usable land area and the proposed budget for the park, as reflected in the economic feasibility report attached to the city's grant application to the state, and the letter of the deputy city manager to the council of November 15, 1971, indicates that out of $382,700 budgeted

for the park, somewhere between $275,000 and $300,000 will be spent for construction of the golf course, club house and related facilities. Of the moneys budgeted, $200,200 is city rather than state and federal money. Considering these factors, it appears that the decision of the council to build and operate the golf course constitutes a "declaration of public purpose" and is essentially legislative in nature.

Apart from the basic question of whether the council's decision to build the golf course was legislative or administrative, respondent contends that in any event the council's action of November 15, 1971, in approving the "park/airport master plan," was simply an administrative decision in furtherance of the legislative policy previously established by the council on September 29, 1966, when it authorized the application to the state for moneys with which to develop the park. Assuming that the council's action in 1966 with reference to the golf course was legislative in nature and that its action in 1971 was administrative, it nonetheless appears that respondent is confusing the initiative power with the right of referendum. While an administrative decision is not subject to reversal by the initiative (or referendum), the people nevertheless have the right to propose legislation amending or repealing the previously established legislative policy, the same as the council can do if it so desires. (Comment, *Scope of the Initiative and Referendum in California* (1966) 54 Cal.L.Rev. 1717, 1736.) The power to legislate, by implication, includes the power to amend or repeal existing legislation. (*Johnston* v. *City of Claremont, supra,* 49 Cal.2d 826, 834; *Blotter* v. *Farrell,* 42 Cal.2d 804, 812-813 [270 P.2d 481]; 6 McQuillin, Municipal Corporations (3d ed.) § 21.10.)

■ As to respondent's contention that petitioners' sole remedy would have been a referendum petition to reverse the 1966 legislative action of the council and board of supervisors, which under state law would have had to be filed within 30 days of the legislative act (Elec. Code, § 4051), we can only respond that we find no authority, and respondent cites none, for the proposition that the failure to assert a referendum petition within the time allowed by law forecloses the power to seek a change in the legislative policy by the initiative process. To so hold would thwart the initiative power.

Respondent next contends that the measure purports to amend the county general plan as amended on November 22, 1966 (to include the park as a recreation element therein), and that such amendment cannot be accomplished by the initiative process because of special hearing procedures required by the state Planning and Zoning Law (Gov. Code, § 65000 et seq.) to amend a general plan. Respondent appears to have overlooked the fact that in 1967 the city annexed the park land, and as a consequence

the land is subject to city, rather than county, jurisdiction and planning procedures. (34 Cal.Jur.2d, Municipal Corporations, § 80, pp. 677-678.) We have been furnished no information as to the contents of the city's general plan and the record is bare of any formal action by the city council or city planning commission with reference to the park after annexation and until November 15, 1971, when the council approved the "park/airport master plan." However, even assuming that by November 15, 1971, the golf course was a part of a general plan of the city, it appears that the electors have the right to amend the plan by the initiative process.

■ Visalia is a charter city and, subject only to constitutional limitation and preemptive state law, the charter is the supreme law of the city with respect to its municipal affairs. (Cal. Const., art. XI, § 3, subd. (a); *Harman* v. *City & County of San Francisco,* 7 Cal.3d 150, 161 [101 Cal. Rptr. 880, 496 P.2d 1248]; *City of Grass Valley* v. *Walkinshaw,* 34 Cal.2d 595, 598-599 [212 P.2d 894].) The adoption and amendment of a general plan is a local legislative matter and not of statewide concern. (*O'Loane* v. *O'Rourke,* 231 Cal.App.2d 774, 783-785 [42 Cal.Rptr. 283]; *Reagan* v. *City of Sausalito, supra,* 210 Cal.App.2d 618, 624-625; *Fletcher* v. *Porter,* 203 Cal.App.2d 313, 318-320 [21 Cal.Rptr. 452].)

Article XIII of the charter, entitled "City Planning," in section 1, after authorizing the appointment of a planning commission with such powers and duties as the council prescribes, provides that: "The Planning Commission shall have the power and duty to: (a) Recommend to the Council, after a public hearing thereon, the adoption, amendment or repeal of a General Plan or any part thereof, for the physical development of the City; . . ." While this provision circumscribes the authority of the planning commission with respect to general plans, it does not purport to prohibit the legislative body of the city, i.e., the council, from amending the general plan.

Article III of the charter, entitled "Powers of City," in section 1 thereof, provides in part: ". . . that where the general laws of the State provide a procedure for the carrying out and enforcement of any rights or powers belonging to the City, said procedure shall control and be followed unless a different procedure shall have been provided in this charter or by ordinance."

It perhaps can be argued that the provisions of Government Code section 65356.1[4] have been incorporated into the charter and that the council

---

[4]Government Code section 65356.1 reads: "When it deems it to be in the public interest the legislative body may change or add to all or a part of an adopted general plan. The legislative body shall first refer the proposed change or addition to the

cannot, on its own, amend the plan without first referring the proposed amendment to the planning commission for a public hearing and report. However, Government Code section 65700[5] provides that the provisions of "this chapter" (chapter 3 of Planning and Zoning Law) shall not apply to a charter city except to the extent that the same may be adopted by charter or ordinance of the city.

No ordinance has been cited which incorporates into city planning the procedures of state law, and it is questionable whether article III, section 1, of the charter can be said to adopt the provisions of Government Code section 65356.1. (We note in passing that the council, on November 15, 1971, apparently approved the "park/airport master plan" without first referring the matter to the planning commission, thus suggesting that either the master plan is not a part of the general plan of the city, or if a part, that the provisions of Gov. Code, § 65356.1 are inapplicable.) However, even assuming that the electors, in framing the charter, intended to so restrict the legislative power of the council, this does not foreclose the people from amending the plan by the initiative process. As previously noted, article VI, section 1, of the charter expressly and in unequivocal terms provides that the *legislative power of the city* shall be vested not only in the council *but in the people through the initiative and referendum.* The initiative power extends to all municipal legislation (Cal. Const., art. IV, § 1; *Hopping* v. *Council of City of Richmond,* 170 Cal. 605, 609-610 [150 P. 977]) and must be liberally construed. (*Farley* v. *Healey, supra,* 67 Cal.2d 325, 328; *Hunt* v. *Mayor & Council of Riverside,* 31 Cal.2d 619, 628 [191 P.2d 426]; *Martin* v. *Smith,* 176 Cal.App.2d 115, 117 [1 Cal.Rptr. 307]; *McClure* v. *Nye,* 22 Cal.App. 248, 251 [133 P. 1145].) As stated in *Spencer* v. *City of Alhambra,* 44 Cal.App.2d 75, at page 78 [111 P.2d 910]: "When, therefore, the people phrased the foregoing sections pertaining to these powers [initiative and referendum] in such broad, general and unambiguous language, the conclusion seems inevitable that thereby it was intended that legislation on every municipal subject should, unless expressly or by clear and necessary implication excluded by other sections,

planning commission for a report. Before making such report the planning commission shall hold at least one hearing on the proposed change or addition. Notice of the time and place of such hearing shall be given in the time and manner specified in Section 65351 of this article. The planning commission's report shall be completed not later than 90 days after the referral."

[5]Government Code section 65700 reads: "The provisions of this chapter shall not apply to a charter city, except to the extent that the same may be adopted by charter or ordinance of the city; except that charter cities shall adopt general plans in any case, and such plans shall be adopted by resolution of the legislative body of the city, or the planning commission if the charter so provides, and such plans shall contain the elements specified in Section 65302."

be subject to initiative action through the adoption of ordinances by the people."

■ We believe that article XIII, pertaining to the amendment of a general plan, article III, pertaining to the powers of the city, and article VI, pertaining to the initiative power, reasonably can be reconciled as giving both the people and the council (either with or without reference of the amendment to the planning commission) the power to amend a general plan. We find no clear and necessary implication from any charter provision which excludes the people's right to initiate an amendment to the general plan. In the absence of such a compelling exclusion, the initiative power should be sustained. (*Fletcher* v. *Porter, supra,* 203 Cal.App.2d 313, 322; *Spencer* v. *City of Alhambra, supra,* 44 Cal.App.2d 75, 78.)

In an analogous situation in *Bayless* v. *Limber, supra,* 26 Cal.App.3d 463 (hear. den. by div. ct. Sept. 7, 1972), it was held that an amendatory zoning ordinance proposed by the electors of the City of Whittier (to prohibit oil well drilling in residential areas) was within the initiative power reserved to the people even though conflicting with special hearing procedures established by statute. The cases of *Hurst* v. *City of Burlingame,* 207 Cal. 134 [277 P. 308], and *Laguna Beach Taxpayers Assn.* v. *City Council,* 187 Cal.App.2d 412 [9 Cal.Rptr. 775], cited by respondent for the proposition that amendatory zoning ordinances (and by analogy general plan amendments) may not be enacted by the initiative process, were distinguished by the court in *Bayless* as involving *general law* cities, rather than charter cities.

The following language from *Bayless* v. *Limber, supra,* 26 Cal.App.3d 463, 469-470, is in point: "In holding that in a chartered city the mode of enactment of zoning ordinances by the initiative process does not have to conform to the notice and hearing requirements which obtain when such ordinances are enacted by a city council, we see no denial of constitutional procedural due process. Due process in lawmaking is not the same as due process in the adjudication of controversies. (See *Adler* v. *City Council, supra,* 184 Cal.App.2d at pp. 777-778; 1 Davis, Administrative Law Treatise (1958) § 7.01, pp. 407-408; *City of Louisville* v. *McDonald* (Ky. 1971) 470 S.W.2d 173, 177; *Cascio* v. *Town Council of Town of West Hartford* (1969) 158 Conn. 111 [256 A.2d 685].) Generally speaking, a hearing on a legislative matter is held for the purpose of informing the lawmakers regarding relevant facts and policy considerations; it is not held for the protection of individual rights, property or otherwise. (See *Wilson* v. *Hidden Valley Mun. Water Dist.,* 256 Cal.App.2d 271, 279-281 [63 Cal.Rptr. 889].) Unless constitutionally compelled, the requirements for lawmaking by the legislative process should not be imposed upon lawmaking by the initiative

process. All that the charter of the City of Whittier requires with regard to the latter process is that it be done in accordance with the Elections Code to the extent the code does not conflict with the charter. The electoral process itself normally provides both notice and an opportunity to be heard to all electors, by written arguments (see Elec. Code, § 4017) and otherwise. In our view neither the United States Constitution nor the California Constitution requires more. [Citations.]"

■   For the reasons stated above, we cannot hold the proposed initiative measure invalid as conflicting with special procedures provided by state law governing amendments of general plans. Under the current posture of the law, it would appear that if there is a conflict, the power of the people to legislate by the initiative process will prevail.

Respondent's contention that the proposed legislation contains two prongs which are incompatible (that the measure proposes either a golf course or a park, but not both) and thus denies the electorate due process and equal protection of the law under the Fourteenth Amendment to the United States Constitution, likewise appears to be without substance. The language in question is the last paragraph of the resolution, which provides: "Now, THEREFORE, be it resolved that the City of Visalia cannot own or operate a golf course at the Plaza Regional Park. Be it further resolved that the 200 acres of the Plaza Regional Park must be a recreational facility for multiple recreational usage by all elements of the Visalia Community." The plain language of the initiative states that the city shall not own or operate a golf course "at the Plaza Regional Park," and the measure does not place the existence of the park in issue. We must presume that the people of Visalia know that their general plan includes a regional park at the airport and will understand that the proposed measure is only to bar the city from owning and operating a golf course thereon. Any possibility of confusion on this point will be resolved by the publicity certain to accompany the proposed measure, should it qualify for the ballot, and in the ballot arguments applicable thereto.

The argument that the measure must fall because the proposal disenfranchises those opposed to both a golf course and a park is similarly without merit. Any valid proposal offering a choice between two alternatives can be said to disenfranchise those who desire a third alternative; yet most propositions on state and local ballots give the electors a choice between two alternatives and no third choice is given.

Finally, respondent cites *Millbrae Association for Residential Survival* v. *City of Millbrae*, 262 Cal.App.2d 222 [69 Cal.Rptr. 251], for the proposition that petitioners are barred by the equitable doctrine of "laches" from

initiating legislation to reverse the council's action, as well as seeking relief by way of an extraordinary writ. *Millbrae* is not in point; it did not involve an initiative or referendum but rather the rights of property owners who had materially changed their position during a two-year period during which plaintiffs knowingly had failed to pursue their remedy by not contesting the validity of a rezoning ordinance. Respondent, a representative of the body politic, does not assert any such prejudice in the case at hand. Any contention of prejudice to the city occasioned by allowing the people to vote on the initiative measure will be answered by the electors at the ballot box. ■ Absent a showing of prejudice, laches is not a defense to a writ proceeding. (5 Witkin, Cal. Procedure (2d ed. 1971) Extraordinary Writs, § 120, p. 3897.)

Petitioners seem to have acted with ordinary diligence in presenting their initiative measure. The November 15, 1971, action of the council in approving the "park/airport master plan" was the first formal action by the council pertaining to the park since 1967 when the city executed the agreement with the state for a grant to develop the park and annexed the land. The fact the council felt it necessary in November 1971 to formally approve a plan which included a golf course suggests that until this time the council's plans for the park and golf course were tentative and subject to conditions not apparent from the record before us. Petitioners appeared at the November 15, 1971, council meeting and voiced objection to the plan. Their vocal opposition was promptly transformed into efforts to circulate the initiative measure. After obtaining what they considered to be sufficient signatures in support of the measure, they presented the petition to respondent for processing. Their actions cannot be described as dilatory.

■ For the reasons above stated, we cannot find the proposed ordinance to be patently invalid, nor can we find that a compelling showing has been made for judicial interference with the initiative process. (*Gayle* v. *Hamm, supra,* 25 Cal.App.3d 250, 255.)

We, of course, make no determination as to the validity of the signatures on the petition or whether the petition has been signed by the requisite number of voters, which can be determined only after processing by the clerk as required by law.

Let a peremptory writ of mandate issue requiring respondent to accept the initiative petition and all sections thereof for filing, and to examine

same and certify the results of said examination, along with said petition, to the city council, as required by law.

Gargano, Acting P. J., and Brown (G. A.), J., concurred.

EXHIBIT 1

RESOLUTION TO BAR THE CITY OF VISALIA

FROM OWNING AND OPERATING A GOLF COURSE AT THE PLAZA REGIONAL PARK

WHEREAS, it is detrimental to the total needs of the City of Visalia to own and operate a municipal golf course and,

WHEREAS, the immediate recreational needs of the residents and taxpayers of Visalia do not include a golf course which will be built and operated at the taxpayers expense and,

WHEREAS, there are already existing recreational facilities owned and operated by the City of Visalia which need renovation and improvement and,

WHEREAS, we feel that it is not correct for the City of Visalia to compete with private enterprise at the expense of the taxpayer and,

WHEREAS, we feel the operation of an 18-Hole Municipal Golf Course would be a losing business operation and,

Now, THEREFORE, be it resolved that the City of Visalia cannot own or operate a golf course at the Plaza Regional Park. Be it further resolved that the 200 acres of the Plaza Regional Park must be a recreational facility for multiple recreational usage by all elements of the Visalia Community.

January 14, 1972