[Civ. No. 10927. Third Dist. Mar. 10, 1965.]

D BEVERLY HUGHES et al., Plaintiffs and Respondents, v. CITY OF LINCOLN et al., Defendants and Appellants.

Robert J. Trombley for Defendants and Appellants.

Bowers & Sinclair and Floyd H. Bowers for Plaintiffs and Respondents.

FRIEDMAN, J.—On July 10, 1962, the City Council of the City of Lincoln adopted a resolution directing fluoridation of the municipal water supply, subject to the approval of the State Board of Public Health. A group of electors circulated

a petition proposing an initiative ordinance to prohibit addition of fluorides to the city's public water supply. On September 15, 1963, the city clerk submitted the petition to the council with a certificate showing that it was signed by more than 15 per cent of the municipal voters. When a proposed initiative ordinance bearing that percentage of signatures is presented to the city council, the law requires it either to adopt the ordinance or immediately call a special election for its submission to the voters. (Elec. Code, § 4011.) The Lincoln city council refused to take either step. Several electors then filed this mandate action to force the city council to submit the proposed ordinance to election. After a hearing the lower court issued a peremptory writ and the city appeals.

Essentially, the city's position may be described as follows: An ordinance proposed by initiative must be one that the city council could itself enact; the Legislature has adopted a comprehensive scheme entrusting control of domestic water supplies to the State Department of Public Health, as a result of which a municipal decision to fluoridate becomes an administrative rather than legislative act, hence not subject to the initiative power of the municipal electors. We reject this position.

The courts have evolved various tests for ascertaining the scope of the initiative and referendum powers in their application to counties and cities. ■ These powers apply to county and city measures which are legislative in character. (*Johnston* v. *City of Claremont,* 49 Cal.2d 826, 834 [323 P.2d 71] ; *Hopping* v. *Council of City of Richmond,* 170 Cal. 605, 611 [150 P. 977] ; *Reagan* v. *City of Sausalito,* 210 Cal.App.2d 618, 621 [26 Cal.Rptr. 775] ; *Martin* v. *Smith,* 184 Cal.App.2d 571, 575 [7 Cal.Rptr. 725].) They do not extend to executive or administrative actions of the local legislative body. (*Simpson* v. *Hite,* 36 Cal.2d 125, 129 [222 P.2d 225] ; *Housing Authority* v. *Superior Court,* 35 Cal.2d 550, 558 [219 P.2d 457] ; *Chase* v. *Kalber,* 28 Cal.App. 561, 568, et seq. [153 P. 397].)

■ The vague legislative-administrative dichotomy has been crystallized to some extent in the oft-quoted formulation in *McKevitt* v. *City of Sacramento,* 55 Cal.App. 117, 124 [203 P. 132] : "Acts constituting a declaration of public purpose, and making provision for ways and means of its accomplishment, may be generally classified as calling for the exercise of legislative power. Acts which are to be deemed as acts of administration, and classed among those governmental powers

properly assigned to the executive department, are those which are necessary to be done to carry out legislative policies and purposes already declared by the legislative body, or such as are devolved upon it by the organic law of its existence." (*Reagan* v. *City of Sausalito, supra,* 210 Cal.App.2d at pp. 621-622; *Fletcher* v. *Porter,* 203 Cal.App.2d 313, 321 [21 Cal.Rptr. 452]; *Martin* v. *Smith, supra,* 184 Cal.App.2d at p. 575; see also 5 McQuillin on Municipal Corporations (3d ed.) pp. 255-256; Comment, *Limitations on Initiative and Referendum,* 3 Stan.L.Rev. 497, 502-504.)

A second test is superimposed upon the first when the local proposal deals with a subject affected by state policy and state law. If the subject is one of statewide concern in which the Legislature has delegated decision-making power, not to the local electors, but to the local council or board as the state's designated agent for local implementation of state policy, the action receives an "administrative" characterization, hence is outside the scope of the initiative and referendum. (*Simpson* v. *Hite, supra,* 36 Cal.2d at p. 131; *Riedman* v. *Brison,* 217 Cal. 383, 387-388 [18 P.2d 947]; *Mervynne* v. *Acker,* 189 Cal.App.2d 558, 562, 565 [11 Cal. Rptr. 340]; *Alexander* v. *Mitchell,* 119 Cal.App.2d 816, 826 [260 P.2d 261].) "When the sole basis for a determination is whether a certain 'contingent effect' exists to warrant local application of state legislation, the exercise of that narrow authority is an administrative act and not a legislative one." (*Housing Authority* v. *Superior Court, supra,* 35 Cal.2d at p. 558; *Andrews* v. *City of San Bernardino,* 175 Cal.App.2d 459, 462 [346 P.2d 457].)

On the other hand, the matter may be one of local rather than statewide concern. In that case a local decision which is intrinsically legislative retains that character even in the presence of a state law authorizing or setting limits on the particular field of action. (*Reagan* v. *City of Sausalito, supra,* 210 Cal.App.2d at pp. 625-628; *Fletcher* v. *Porter, supra,* 203 Cal.App.2d at pp. 318-319; *Mefford* v. *City of Tulare,* 102 Cal.App.2d 919, 923-924 [228 P.2d 847].) If the proposal is an exercise of police power directly delegated to counties and cities by article XI, section 11, of the State Constitution, then it is likely to constitute an act of legislation rather than administration. (See *Dwyer* v. *City Council of City of Berkeley,* 200 Cal. 505, 511-512 [253 P. 932].)

A third test has been formulated to delineate scope of the initiative power, as distinguished from the referendum:

It is well recognized that "an ordinance proposed by the electors of a county or of a city in this state under the initiative law must constitute such legislation as the legislative body of such county or city has the power to enact under the law granting, defining and limiting the power of such body." (*Hurst* v. *City of Burlingame*, 207 Cal. 134, 140 [277 P. 308], and quoted in *Blotter* v. *Farrell*, 42 Cal.2d 804, 810 [270 P.2d 481].)

■ The operation of public water systems by chartered cities has been characterized as a "municipal affair" rather than a matter of statewide concern. (*City of South Pasadena* v. *Pasadena Land etc. Co.*, 152 Cal. 579, 593-594 [93 P. 490]; *Mefford* v. *City of Tulare, supra*, 102 Cal.App.2d at p. 924.)

■ Nonchartered cities such as Lincoln are authorized by state law to acquire and operate domestic water supply facilities. The authorizing statutes (Gov. Code, §§ 38730, 38742) are very general and evince no intent to exclude local autonomy in the administration of municipal water systems. ■ In California, as in other states, the action of city councils directing fluoridation of municipal water supplies is regarded as an exercise of the local police power. (*DeAryan* v. *Butler*, 119 Cal.App.2d 674, 681-682 [260 P.2d 98], cert. den. 347 U.S. 1012 [74 S.Ct. 863, 98 L.Ed. 1135]; *Schuringa* v. *City of Chicago*, 30 Ill.2d 504 [198 N.E.2d 326]; *Wilson* v. *City of Council Bluffs*, 253 Iowa 162 [110 N.W.2d 569]; *Readey* v. *St. Louis County Water Co.* (Mo.) 352 S.W.2d 622; see Note 43 A.L.R.2d 453; Dietz, *Fluoridation and Domestic Water Supplies in California*, 4 Hast.L.J. 1; Nichols, *Freedom of Religion and the Water Supply*, 32 So.Cal.L.Rev. 158; Notes, 12 Am.U.L.Rev. 97; 38 Notre Dame Law. 71; 24 Md.L.Rev. 353.)

In recent years fluoridation of public water supplies as a means of reducing the incidence of dental caries among children has been the subject of widespread and heated controversy. Strenuously advocated by the dental and medical experts, it is widely opposed upon a variety of religious, political and scientific grounds. The debate has been heavily annotated and we need not restate easily available references. Many are collected in Dietz, *op. cit.*, and in 38 Notre Dame Lawyer 71, et seq. The traditional goals of water treatment are purity and potability. Fluoridation—aside from claims of merit or demerit—seeks a different goal, medication of public water supplies for a therapeutic purpose.

■ In meeting its responsibility for local health and safety, a city legislative body may decide that the traditional,

accepted goals of water treatment are enough. Alternatively, it may decide to fluoridate, thus aiming for the relatively new and relatively controversial goal of preventive dental therapy. In a real sense, such a decision is one "constituting a declaration of public purpose, and making provision for ways and means of its accomplishment . . . ." (*McKevitt* v. *City of Sacramento, supra,* 55 Cal.App. at p. 124.) ▮ Intrinsically therefore, as well as in its police power origin, the decision to fluoridate is legislative rather than administrative.

This view was adopted by the Supreme Court of Missouri in *State* ex rel. *Whittington* v. *Strahm* (Mo.) 374 S.W.2d 127. There the court upheld a referendum against a municipal ordinance clothed as a routine appropriation for the purchase of fluoridation equipment for the city water plant. Noting that the addition of fluoride went beyond the established policy of adding chemicals for purification, the court held that the decision to fluoridate was legislative. (See also discussion in 43 A.L.R.2d at pp. 453-454.)

▮ Contrary to the position taken by the city of Lincoln, the statutory scheme empowering the State Board of Public Health to approve or disapprove methods of water treatment does not transmute the city council into an administrative agent of state policy. The Health and Safety Code requires municipal and other suppliers of water for domestic purposes to secure permits from the state board. (§ 4011.) Methods of water treatment pursuant to an existing permit may not be changed without application for and receipt of an amended permit. (§ 4011.5.) Permit applications must be accompanied by plans and specifications showing all the sanitary and health conditions affecting the system. (§ 4012.) If the state board determines, it may require an applicant or permit holder to make changes necessary to ensure that the water shall be "pure, wholesome, and potable." (§§ 4016-4019.) Upon finding that the water is pure, wholesome and potable, the board *shall* grant a permit. (§ 4021.) A permit may be rejected or suspended if the board finds that the permittee is supplying impure, unpotable or health-endangering water. (§ 4022.) It is unlawful to furnish water for human consumption or domestic purposes which is impure, unwholesome, unpotable, polluted or dangerous to health. (§ 4031.)

These statutes, constituting the only statutory regulation of the quality of water for human consumption, are aimed at the objectives of safety and potability. (*DeAryan* v. *Butler, supra,* 119 Cal.App.2d at p. 681.) Essentially, they cast the

state board in the role of a censor upon local decisions. Within the relatively wide latitude permitted by health and potability standards, proposals for treatment or changes in treatment originate with the municipal water supplier, not with the state. Section 4021, in mandatory terms, requires that a permit be granted if the board makes a finding of purity and potability, demonstrating a design to promote rather than destroy local autonomy over treatment methods up to the point where purity and potability are threatened.

This statutory plan does not incorporate any standard dealing with the fortification of water for therapeutic purposes. To be sure, the addition of fluoride to public water, or the cessation of fluoridation under an existing permit, may be accomplished only with permission of the state board. This permission, however, does not turn on the protection of dental health. If the state board finds that the initiation of fluoride treatment will not affect the purity, potability or safety of the water, section 4021 demands that a permit be issued. If the board finds that cessation of fluoride treatment will not make the water impure, unpotable or dangerous, it must permit cessation. This scheme of statutory regulation does not express any state policy, one way or the other, on fluoridation as a therapeutic measure. Instead, it is focused on the orthodox ''pre-fluoridation'' goals of water treatment. Thus, in deciding whether or not to fluoridate, a city council acts as the legislative exponent of local policy, not as the administrative instrumentality of state policy. The scheme of state legislation does not affect the intrinsically legislative character of a decision for or against fluoridation of municipal water supplies.

On December 4, 1963, the State Board of Public Health issued an amended permit to the city of Lincoln for a program of water treatment including fluoridation. We take judicial notice of that action. (Code Civ. Proc., § 1875, subd. 3.) The proposed initiative ordinance would prohibit the method of treatment now allowed by the state permit. State law, however, prevents modification of the city's treatment method without a further amendment of its permit. (Health & Saf. Code, § 4011.5.) Adverting to the pronouncement that an initiative ordinance must constitute such legislation as the council itself has power to pass, the city now urges that the city council would not have power to decree cessation of fluoridation without a state permit, *ergo* the voters possess no greater power.

The argument comes close to an assertion that a council

decision to fluoridate, once implemented, may not be reversed by the very council which made it. As we have held, the proposed initiative ordinance would operate in an area of local concern only partially occupied by state law. (Cf. *In re Lane,* 58 Cal.2d 99 [22 Cal.Rptr. 857, 372 P.2d 897].) It may be enforced, of course, only if it is "not in conflict with general laws." (Cal. Const., art. XI, § 11; *Simpson* v. *City of Los Angeles,* 40 Cal.2d 271, 278 [253 P.2d 464].) The fallacy of the city's argument is its assumption of a nonexistent conflict. If adopted by the electors, the initiative ordinance will receive an interpretation which confers validity rather than one which results in nullity. (Civ. Code, § 3541; *Brooks* v. *Stewart,* 97 Cal.App.2d 385, 390 [218 P.2d 56]; 6 McQuillin on Municipal Corporations (3d ed.) pp. 122-123.) Unless such a construction will defeat its apparent purpose, it is to be construed in harmony with applicable provisions of state law. (6 McQuillin, *op. cit.,* p. 101.) Upon adoption of the ordinance the state permit law would become one of its implicit conditions, contemplating the city's application to the State Board of Public Health for an amended permit and termination of fluoridation upon issuance of a permit approving termination.

Judgment affirmed.

Pierce, P. J., and Van Dyke, J.,* concurred.

---

*Retired Presiding Justice of the District Court of Appeal sitting under assignment by the Chairman of the Judicial Council.