[No. A033116. First Dist., Div. Three. Apr. 7, 1987.]

W. W. DEAN & ASSOCIATES et al., Plaintiffs and Respondents, v.
CITY OF SOUTH SAN FRANCISCO et al., Defendants and
Respondents;
SOUTH SAN FRANCISCO CITIZENS FOR OUR MOUNTAIN,
Intervener and Appellant.

1370

**COUNSEL**

Ann Broadwell, Thomas R. Adams and Adams, Broadwell & Russell for Intervener and Appellant.

William W. Sterling, Peter H. Goldsmith, Heller, Ehrman, White & McAuliffe, Howard N. Ellman, John D. Hoffman and Ellman, Burke & Cassidy for Plaintiffs and Respondents.

No appearance for Defendants and Respondents.

**OPINION**

SCOTT, J.—In issue is whether the adoption by the City Council of the City of South San Francisco (City) of an amendment to a development plan formulated pursuant to the Endangered Species Act (16 U.S.C. § 1531 et seq.) (Act) constitutes an administrative act not subject to referendum. The lower court answered in the affirmative and issued a writ of mandate prohibiting a referendum election. We affirm.

I

*Standard of Review on Appeal*

■ We follow the usual standard of appellate review. Our review is limited to a determination of whether there was substantial evidence to support the judgment of the trial court issuing the writ of mandate. (*Appelgate* v. *Dumke* (1972) 25 Cal.App.3d 304, 314 [101 Cal.Rptr. 645]; *Sunseri* v. *Board of Medical Examiners* (1964) 224 Cal.App.2d 309, 313 [36 Cal.Rptr. 553].) The facts are viewed in the light most favorable to the findings of the trial court. (*Appelgate, supra,* at pp. 307, 315.)

II

*Background on Development of San Bruno Mountain*

San Bruno Mountain (Mountain) contains approximately 3,600 acres of land. In 1980, respondent Visitacion Associates, in response to intense opposition to development, donated and sold approximately 2,000 acres which it owned to San Mateo County and the State of California and agreed to limit development to one-third of the mountain. Shortly thereafter, it was discovered that the Mission Blue butterfly, which had been listed by the United States Fish and Wildlife Service (Service) as an endangered species in 1976, inhabited the Mountain. Further development, therefore, was restricted by the Act. In response, representatives of the City and County of San Mateo (County), the City, the Service, and the Committee to Save San Bruno Mountain, among others (collectively the Committee) initiated a biological study to determine whether development would result in the extermination of the species. The study concluded that because of encroaching brush, the butterflies' continued existence was threatened even without development. On the basis of the study, the Committee began formulating a plan which would both protect endangered habitat and allow for limited development.

In 1982, Congress, aware of and in recognition of the value of such a plan,

amended section 10(a) of the Act (16 U.S.C. § 1539)[1] to provide more flexibility in the regulation of development affecting endangered species. The purpose of the amendment was to allow developers to submit to the Secretary of the Interior "conservation plans which provide long-term commitments regarding the conservation of . . . species and long-term assurances to the proponent of the conservation plan [i.e., developer] that the terms of the plan will be adhered to and that further mitigation requirements will only be imposed in accordance with the terms of the plan." (H.R.Conf.Rep. No. 97-835, 97th Cong., 2d Sess., *supra,* p. 30 (1982).) Congress specifically addressed the issue of amendments to the plan: because "circumstances and information may change over time and . . . the original plan might need to be revised . . . any plan approved for a long-term permit will contain a procedure by which the parties will deal with unforeseen circumstances." (H.R.Conf.Rep. No. 97-835, 97th Cong., 2d Sess., *supra,* p. 31 (1982).)

Thereafter, the Committee finalized a habitat conservation plan (HCP) and a contract to implement the HCP (HCP Agreement). The HCP Agreement was signed by the Service, the California Department of Fish and Game, the California Department of Parks and Recreation, the County, the City, Visitacion Associates, respondent W. W. Dean & Associates (the holder of an option to purchase a 337-acre parcel from Visitacion Associates) (Dean), and others. Following a long period of public review and public hearings, which included the preparation of an environmental impact report (EIR) pursuant to state law, the City approved by resolution in November 1982 the execution of the HCP Agreement. Both appellant and respondents agree that the resolution constituted legislative action. The resolution was not challenged by the referendum process.

The HCP establishes a program for the enhancement of the ecology of all remaining open space on the Mountain. The HCP and HCP Agreement provide for the dedication of approximately 800 acres for open space (in addition to the 2,000 acres previously sold or dedicated), a supervised program of habitat conservation and enhancement, permanent private funding for conservation based upon initial developer contributions and subsequent homeowner assessments, and residential and commercial development within defined boundaries.

The HCP and HCP Agreement set forth a detailed procedure for amendments. Section IX of the HCP Agreement, entitled "Amendments," subsection B, provides for amendments after (1) a noticed public hearing; (2)

---

[1]Endangered Species Act Amendments of 1982 (Pub.L. No. 97-304 (Oct. 13, 1982) 96 Stat. 1422-1424). The House Conference Report states that the San Bruno Mountain Plan is a "model" plan and that "similar conservation plans should be measured against the San Bruno plan . . . ." (H.R.Conf.Rep. No. 97-835, 97th Cong., 2d Sess., p. 31 (1982).)

written approval of the landowners affected by the amendment, the jurisdiction with local land use authority, the County, and the Service, and (3) a biological study which demonstrates that the amendment will not conflict with the primary purpose of the HCP. Subsection B further provides: *"Approval of amendments pursuant to this Section IX(B) is subject to the consent of only those entities mentioned in Section IX(B) and no other entities."*[2] (Italics added.) The City then sought a development permit from the Secretary of the Interior based upon the HCP pursuant to section 1539 of the Act. The permit was issued.[3]

The City subsequently approved, after public hearing, Dean's specific plan for the development of the south slope area of the Mountain (Terrabay Project), which was consistent with the City's amended general plan and the HCP. The specific plan provided that the grading proposals should "be considered informational only" and that detailed soil and geotechnical studies would be prepared and their recommendations implemented. Dean then had prepared soils and geotechnical studies which disclosed soil instability in areas designated for preserved habitat which could develop into hazardous landslide problems if Dean's project went forward. The City therefore required Dean to seek an amendment to the HCP, HCP Agreement, and permit to allow slide repairs in these unstable areas. Without the amendment, the Terrabay Project could not go forward because there was no feasible redesign alternative. The amendment Dean ultimately proposed (in accordance with the findings of a supplemental EIR) provided for the elimination of 24 residential units and additional upslope grading with retaining walls in areas designated for habitat conservation. The amendment requires temporary disturbance of approximately 25 acres designated for conservation, with a minimal short-term impact on the total Mission Blue Mountain population. The amendment also requires Dean to fund offsite habitat enhancement on an additional 30 acres which were not originally scheduled for enhancement under the HCP. The supplemental EIR addressed the amendment's visual impact: ". . . these changes are impercep-

---

[2]Appellant contends that under section IX.A. of the Agreement, the parties were not authorized to effect the amendment pursuant to section IX.B. because the amendment changed the boundaries of the development area. The Service, however, implicitly approved the amendment pursuant to section IX.B. Further, the amendment did not change the boundaries of the development area. The amendment does not entitle Dean to develop but only temporarily to disturb the 25 acres which will be revegetated.

[3]Following the issuance of the permit, a newly formed environmental group challenged the permit in *Friends of Endangered Species, Inc.* v. *Jantzen* (N.D.Cal. 1984) 589 F.Supp. 113. Plaintiff contended that the issuance of the permit constituted an abuse of the Service's discretion and a violation of the National Environmental Policy Act. The Ninth Circuit affirmed the district court's validation of the permit in every respect, noting Congress's findings that the San Bruno HCP was a "model" plan. (*Friends of Endangered Species, Inc.* v. *Jantzen* (9th Cir. 1985) 760 F.2d 976, 982-983.)

tible and are insignificant by comparison to the visual impact resulting from the presence of the development itself."

The City followed the procedure for adoption of amendments under section IX.B. of the HCP Agreement, set forth *infra*. The City obtained the consent of the City, the County, and the Service; the amendment was supported by a biological study showing it was consistent with the objectives of the HCP; and the City held a public hearing on the proposed amendment. The City approved the amendment by resolution No. 156-85 on July 10, 1985.

Following the City clerk's certification of the necessary signatures on a referendum petition, the City council voted to set a referendum election on the amendment. In response, respondents filed in the superior court a petition for writ of mandate enjoining the City from holding the referendum election. Following extensive briefing and a hearing on the petition, the court found the amendment constituted merely an implementation of the legislative policies already enunciated after extensive hearings, and therefore was an administrative act not subject to referendum.

## III

### Governing Statutory and Case Law

■ Legislative acts of a city which establish general policies and objectives, and the ways and means of accomplishing them, are subject to the referendum process. (*Merriman* v. *Board of Supervisors* (1983) 138 Cal.App.3d 889, 891 [188 Cal.Rptr. 343]; *Fishman* v. *City of Palo Alto* (1978) 86 Cal.App.3d 506, 509 [150 Cal.Rptr. 326].) Administrative actions, which merely carry out those policies and objectives and are necessary to implement the ways and means already adopted by the Legislature, are not subject to referenda. (*Ferrini* v. *City of San Luis Obispo* (1983) 150 Cal.App.3d 239, 249 [197 Cal.Rptr. 694]; *Fishman, supra*, at p. 509; *Lincoln Property Co. No. 41, Inc.* v. *Law* (1975) 45 Cal.App.3d 230 [119 Cal.Rptr. 292].) "This legislative-administrative dichotomy reflects a determination to balance the ideal of direct legislation by the people against the practical necessity of freeing municipal governments from time consuming and costly referenda on merely administrative matters. [Citations.]" (*Fishman, supra*, at p. 509, fns. omitted.)

■ Zoning and rezoning ordinances, and the adoption of and amendments to general plans, are legislative actions. (*Yost* v. *Thomas* (1984) 36 Cal.3d 561, 570 [205 Cal.Rptr. 801, 685 P.2d 1152]; *Arnel Development Co.* v. *City of Costa Mesa* (1980) 28 Cal.3d 511, 516 [169 Cal.Rptr. 904, 620

P.2d 565].) The approval of variances, conditional use permits, and tentative subdivision maps, which involve the application of preestablished standards and conditions to particular land uses, is administrative or "adjudicatory." (See *Horn* v. *County of Ventura* (1979) 24 Cal.3d 605 [156 Cal.Rptr. 718, 596 P.2d 1134]; *Arnel Development Co., supra,* at p. 518.)

In *Valentine* v. *Town of Ross* (1974) 39 Cal.App.3d 954 [114 Cal.Rptr. 678], the Town of Ross adopted schematic plans for a flood control project, reserving rights to approve the detailed plans later. The town council later approved by resolution the detailed plans, and the plaintiff sought a referendum election from the resolution. In holding that the resolution was an administrative act not subject to referendum, the court pointed out that the declaration of public purpose, and the provision of ways and means of its accomplishment, were laid down by the earlier adoption of schematic plans; the later resolution of the town council was an administrative act for their implementation. (*Id.,* at p. 958.)

In *Lincoln Property Co. No. 41, Inc.* v. *Law, supra,* 45 Cal.App.3d 230, the city zoned a tract of land "Planned Community." The city then adopted a development plan in accordance with the zoning which prescribed a number of conditions for the detailed plan to be submitted by the developer. The developer then submitted a detailed plan and tentative subdivision map in accordance with the city's development plan. Following its approval by the city council, certain members of the community filed a referendum petition. The court found that the city's development plan constituted a zoning change in which legislative objectives and conditions of development were laid down. The developer's plan simply carried out those purposes and conditions. The many facets of the detailed plan had been considered at the time of adoption of the development plan. (*Id.,* at pp. 235-236.) The court pointed out that the detailed plan in fact decreased the general size of the buildings approved by the development plan. (*Id.,* at p. 236.) The city's approval of the plan therefore constituted an administrative act not subject to referendum.

The court in *Lincoln Property Co. No. 41, Inc.* distinguished the circumstances of its case from those in *Millbrae Assn. for Residential Survival* v. *City of Millbrae* (1968) 262 Cal.App.2d 222 [69 Cal.Rptr. 251], where substantial alterations to a city's general plan were tantamount to a rezoning of a district and therefore constituted a legislative act subject to referendum. (*Id.,* at p. 236.)

■ In addition to the above criteria distinguishing administrative from legislative acts, when a city acts to implement a comprehensive system of state regulations affecting a matter of statewide concern, it is acting in an

administrative capacity not subject to referendum. (*Yost* v. *Thomas, supra,* 36 Cal.3d at p. 570; *Associated Home Builders etc., Inc.* v. *City of Livermore* (1976) 18 Cal.3d 582, 596, fn. 14 [135 Cal.Rptr. 41, 557 P.2d 473] ["We distinguish those decisions which bar the use of the initiative and referendum in a situation in which the state's system of regulation over a matter of statewide concern is so pervasive as to convert the local legislative body into an administrative agent of the state."].) In *Friends of Mount Diablo* v. *County of Contra Costa* (1977) 72 Cal.App.3d 1006 [139 Cal.Rptr. 469], the county board of supervisors approved the rezoning of a vast tract of land, which was not challenged by referendum. The Local Agency Formation Commission (LAFCO) then approved the reorganization of districts within the rezoned area. The court held that the latter action, taken pursuant to the District Reorganization Act (Gov. Code, § 56452 et seq.), was supplemental to the accomplishment of a state purpose and therefore was administrative and not subject to local referendum. (*Friends of Mount Diablo, supra,* at pp. 1012-1013.)

As a corollary to the above rule, where a local governing body implements federal policy pursuant to a comprehensive plan of federal regulations governing matters of national concern, its actions are administrative and not subject to local referendum. ■ Such result is consistent with the principle of federal preemption: state law is nullified to the extent it stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress. (*Fidelity Federal Sav. & Loan Assn.* v. *De La Cuesta* (1982) 458 U.S. 141, 153 [73 L.Ed.2d 664, 675, 102 S.Ct. 3014]; *California Arco Distributors, Inc.* v. *Atlantic Richfield Co.* (1984) 158 Cal.App.3d 349, 357 [204 Cal.Rptr. 743].) We do not hold that federal law entirely preempts all state and local laws when a development is governed by 16 United States Code section 1539. The development permit here in fact requires the observance of applicable local, state, and federal regulations, e.g., the EIR process and public hearing requirements. ■ We do hold, however, that once the interested parties have adopted a conservation plan, and the federal government has issued a development permit conditioned upon strict compliance with the plan, state and local laws do not govern to the extent they conflict with the plan. One federal court has found that when the Act governs land use, regulations which would otherwise govern are nullified to the extent they conflict with the Act. (*Pacific Legal Foundation* v. *Andrus* (6th Cir. 1981) 657 F.2d 829, 835.)

In the petition for rehearing, appellant contends that if a state has entered into a cooperative conservation agreement with the Secretary of the Interior under 16 United States Code section 1535, there is no preemption of state law. Section 1535(c) provides that the Secretary of the Interior is "authorized to enter into a cooperative agreement . . . with any State which establishes

and maintains an adequate and active program for the conservation of endangered species and threatened species." After the secretary receives a copy of a proposed state program, he may "enter into a cooperative agreement with the State for the purpose of assisting in implementation of the State program." Appellant contends that because California has a federally approved cooperative conservation agreement, state law governs exclusively here.

Section 1535 is irrelevant to the development in this case. The development here is not part of nor governed by any state cooperative agreement under section 1535(c). The HCP was approved and the development permit was issued pursuant to section 1539(a) of the Act. That section allows the Secretary of the Interior, not the states, to permit limited incidental "takings" of listed endangered species pursuant to a conservation plan approved by the Secretary. Section 1535(c) contains no parallel provision for such an incidental "taking" permit because no such state action is authorized by the Act. Moreover, as appellant itself points out, California's Endangered Species Act (Fish & G. Code, § 2050 et seq.) does not even protect insect species such as the endangered butterflies on San Bruno Mountain.

IV

*Discussion*

In the instant case, it is undisputed that the City council's adoption of the HCP and HCP Agreement were legislative acts. The HCP Agreement and, in more comprehensive form, the HCP, detail the objectives of preservation of an ecological balance and the conservation of "the habitat of nearly 400 native plants [and] animals . . . ." They also set forth the ways and means of accomplishing these objectives. They provide for the dedication of open space, the conservation and enhancement of habitat, permanent private funding for conservation, and limited commercial and residential development within definite boundaries designated on maps incorporated in the HCP.

We find the adoption of the amendment was an administrative act. In so finding, we view the amendment in the context of the many interdependent facets of the HCP as a whole. The amendment is consistent with its objectives and the ways and means of accomplishing them. It does not change the provisions for dedication of substantial open space. It does not alter the boundaries of commercial and residential development, because it requires only grading and retaining walls in unstable areas reserved for conservation. These areas will be revegetated. It does not involve additional residential or commercial construction. In fact, it eliminates 24 residences

previously approved and requires additional acreage for habitat enhancement not previously required. Under these circumstances, we cannot say that the amendment calls for a change in land use as proposed under the HCP. Further, the amendment proposes only those changes which are absolutely necessary to enable the Terrabay Project to go forward and implement the HCP Agreement. The record establishes that without the additional grading and retaining walls, the Terrabay Project will not go forward, and funding critical to the implementation of the HCP will be withdrawn.

As in *Lincoln Property Co. No. 41, Inc.* v. *Law, supra,* 45 Cal.App.3d 230, changes of the type proposed by the amendment were contemplated at the time of the adoption of the HCP Agreement. Such changes were inevitable where private landowners had agreed to dedicate hundreds of acres of land for open space and to limit the areas of development prior to expending substantial sums for soils studies. For that reason, the HCP Agreement, section IX.B., contains a detailed procedure for the approval of amendments which ensures consistency with the HCP objectives. Section IX.B. sets forth the standards and conditions for amendments, similar to a general plan's standards and conditions for variances and conditional use permits.

In rebuttal, appellant argues that although Government Code section 65357 anticipates amendments to a general plan and therefore provides the procedure for adoption of amendments, an amendment to a general plan is nevertheless a legislative act. (*Yost* v. *Thomas, supra,* 36 Cal.3d at p. 570.) We find a distinction, however, between an amendment to a general plan governed by Government Code section 65357, and the amendment in this case to a conservation plan governed by the Act which is necessary to implement the plan. Government Code section 65357 provides for the adoption of amendments to a general plan by the legislative body by the same procedure required for the adoption of the original plan. With modifications to a conservation plan under the Act, however, Congress foresaw the need for "long term assurances" to be made to the developer for the completion of its project. The Service therefore approved an administrative procedure for necessary amendments consistent with the objectives of the HCP.

■ Moreover, although generally an amendment to a legislative act is a legislative act (*Yost* v. *Thomas, supra,* 36 Cal.3d at p. 570), the purpose and impact of a modification to a land use plan must be analyzed prior to determining whether it is a legislative or administrative act. That the change is termed an "amendment" should not be the dispositive factor. In *Fishman* v. *City of Palo Alto, supra,* 86 Cal.App.3d 506, a city council modified a previously approved development plan to permit the construction of a screened enclosure for parked cars. The court held that the modification did not amount to a rezoning and was administrative. The court pointed out that

"treating *any* modification of a [zoned] district as a legislative act is inconsistent with the policy behind the legislative-administrative test, *which permits the exercise of some judgment based on the costs and benefits of the referendum procedure.*" (*Id.,* at pp. 511-512, latter italics added.) ██ Similarly, here, the HCP Agreement amendment procedure "permits the exercise of some judgment" by the parties required to give their consent— the City, County, and Service—which, under *Fishman,* is not inconsistent with an administrative act.

We note that the electorate could have rejected by the referendum process the adoption of the HCP Agreement which contained the explicit amendment procedure. The federal government then would have restricted development without the "unique partnership between the public and private sectors in the interest of . . . conservation" fostered by conservation plans. (H.R.Conf.Rep. No. 97-835, 97th Cong., 2d Sess., *supra,* p. 31 (1982).) The voters chose not to do so, but instead to accept the benefits of the HCP and HCP Agreement.

Our conclusion that the adoption of the amendment was an administrative act is not inconsistent with *Yost* v. *Thomas, supra,* 36 Cal.3d 561, where our Supreme Court confirmed that the adoption of a developer's specific plan concurrently with approval of an amendment to a general plan were legislative acts. (*Id.,* at p. 570.) Here, the necessary additional grading and retaining walls did not require an amendment to the City's amended general plan because there is no change in land use such as from single family dwellings to planned community, residential to commercial, or open space to developable. The currently unstable upslope area is to remain open space, but stabilized with retaining walls.

That the adoption of the amendment proposed here was an administrative act is also compelled by the fact that the HCP was formulated and the permit was issued to Dean in accordance with federal law affecting a matter of the utmost national concern. (See *TVA* v. *Hill* (1978) 437 U.S. 153, 174 [57 L.Ed.2d 117, 134, 98 S.Ct. 2279].) The City, therefore, was acting as an administrative agent of the federal government in implementing the Act which precludes the referendum process. Further, the Secretary of the Interior issued Dean a permit on the basis of the HCP Agreement, which provides at section IX.B. that amendments are subject to the consent of *only* the entities designated therein. Forcing a developer to submit an amendment to the referendum process after the requirements of section IX.B. have been satisfied conflicts with overriding federal authority. (See also *Pacific Legal Foundation* v. *Andrus, supra,* 657 F.2d 829, 835.)

Appellant or other concerned citizens were not without means to challenge the adoption of the amendment. Because the amendment was based upon

the findings of a supplemental EIR as well as a determination that it was not inconsistent with the HCP, the City's administrative action could have been challenged under section 1094.5 of the Code of Civil Procedure as an abuse of discretion. (See, e.g., *Bowman* v. *City of Petaluma* (1986) 185 Cal.App.3d 1065, 1071 [230 Cal.Rptr. 413].) That appellant chose not to use this remedy does not confer upon it the right to referendum.

## V

### *Disposition*

The judgment issuing the peremptory writ of mandate is affirmed.

Merrill, J., concurred.

**WHITE, P. J.**—I respectfully dissent from the majority's conclusion that resolution No. 156-85 was an administrative act not subject to referendum. The majority opinion adequately sets out the law regarding what constitutes a legislative act and is therefore subject to the referendum, and what constitutes an administrative act and is therefore not subject to the referendum. However, I disagree with the application of the law in the area to the facts of this case. I also feel that the majority has stated the facts in such a manner as to enhance its position.

The majority agrees that the HCP Agreement which was enacted to implement the HCP was a legislative act. On December 2, 1982, the city approved the Terrabay Specific Plan. On February 2, 1983, the city adopted the zoning ordinance for the Terrabay Project. Although the majority does not state whether these later two actions by the city were legislative or administrative, both parties to this appeal assume that they are legislative.

The Terrabay Specific Plan, which was Dean's specific plan for the development of the south slope area of San Bruno Mountain, provides for the construction of 745 residential units and certain commercial development. The specific plan provided that the grading proposals "shall be considered information only" and that detailed soil and geotechnical studies would be prepared and their recommendations implemented before building permits will be issued for each phase of the specific plan. Dean then prepared these studies which disclosed soil instability in areas designated for preserved habitat which could develop into hazardous landslide problems to the Terrabay Project. The only development affected by the soil instability was the Terrabay Project. The zoning ordinance adopted for the Terrabay Project provides: "All grading plans and operations in the Terrabay Specific Plan

District shall be in compliance with the provisions of the San Bruno Mountain Habitat Conservation Plan."

Thereafter a supplemental EIR/EA and an addendum to the supplemental EIR/EA were prepared which considered the various alternatives to correct the soil instability and to permit the Terrabay Project to be completed. The alternative (No. 2) which was selected provided for grading on 25 acres of land which was to be preserved in its natural state under the HCP and the HCP Agreement. The grading on the additional 25 acres will result in temporary disturbance to land designated as conserved habitat or preserved habitat. The HCP defines preserved habitat as "those portions of the San Bruno Mountain area that will be protected against grading and disturbance and which are now in public ownership or which are identified in the HCP for dedication to the State or County." The HCP Agreement contains a similar definition of preserved habitat. The maps accompanying the description of the South Slope Project show that part of the land in that project is to be undisturbed or in other words preserved habitat. The HCP defines conserved habitat as "those portions of the San Bruno Mountain Area that are presently or hereafter are to be held in fee ownership by the County and/or the State pursuant to the Agreement With Respect to the San Bruno Mountain Area Habitat Conservation Plan." The HCP Agreement contains a similar definition, but states that these lands are to be held pursuant to this agreement as contemplated in section IV hereinbelow. Section IV of the HCP Agreement provides that restrictions on the use of conserved habitat can only be modified by the consent of all the parties to the agreement.

The amendment which was sought to the HCP and the HCP Agreement permitted the temporary disturbance of an additional 25 acres (under the HCP Dean was allowed only to temporarily disturb 33 acres), the reduction of 24 residential units and required Dean to fund habitat enhancement on an additional 30 acres which were not originally scheduled for enhancement under the HCP. Since the City of Brisbane would not agree to the amendment, the amendment could not be based on the consent of all the contracting parties as provided in section IV of the HCP Agreement.

An addendum to the EIR/EA was prepared by the County of San Mateo to "make the HCP EIR/EA and South Slope Supplemental EIR/EA adequately apply to the South Slope geotechnical amendment to the HCP proposed pursuant to Section IX.B of the Agreement with respect to the [HCP]." The majority places great reliance on the fact that the procedure for adoption of the amendment under section IX.B of the HCP Agreement was followed. However, the HCP Agreement is not that clear on the proper procedure for amending the use of conserved habitat. Section IX.A is entitled *"Amendment of Volume II, Chapter VII, of HCP Provisions"* and provides

in part: "The provision of Volume II, Chapter VII of the HCP, with respect to: (i) the boundary of the Conserved Habitat or Development Area; or (ii) any conditions set forth in Chapter VII regarding any Administrative Parcel may be amended only in accordance with this Section IX(A)." There is no question but that the addition of 25 acres that can be graded that were designated as undisturbed land in volume II of chapter VII of the HCP is a boundary change. Section V of the HCP Agreement provides additional support to the interpretation that amendments to the boundaries of conserved habitat can only be accomplished under section IX.A of the agreement with the following sentence: "The boundaries of Conserved Habitat to be offered for dedication by the Landowner to the County shall be as described in said Chapter VII of the [HCP], subject to the provisions of Section IX(A) hereinbelow."

Section IX.B of the HCP Agreement is entitled "*All Other Amendments.*" The question to be considered is whether a boundary change to a preserved habitat can be made under section IX.B of the HCP Agreement despite the above-quoted language from section IX.A of the HCP Agreement. There is no question that the HCP would permit a boundary change to a conserved habitat under a section entitled "All Other Amendments" which is similar to section IX.B of the HCP Agreement. The fact that the HCP permits amendments to boundaries of the conserved habitat under a section entitled "All Other Amendments" which is similar to section IX.B does not mean that section IX.B should be interpreted to allow such amendments. The HCP Agreement provides in this regard as follows: "D. *Interpretation* [¶] This Agreement was prepared as the implementing program and part of the Habitat Conservation Plan. Because the then provisions of the Habitat Conservation Plan were not intended to be a legal document and the desirability of having a single document which could be considered and focused upon by all of the parties for legal effect and consistency in defining the regulatory and proprietary rights, obligations, privileges and authority of the many affected parties, this Agreement shall constitute the sole evidence and basis for the interpretation of its terms and provisions. Without limiting the generality of the foregoing, the other provisions of the Habitat Conservation Plan shall not be referred to in the interpretation of any provision of this Agreement except where such provision makes specific reference to such provision of the Habitat Conservation Plan and then only to the extent of such reference."

It is necessary to look at the language of section IX.B to see if it can be used to amend the agreement in the way sought by Dean. Section IX.B provides "[a]ll other amendments are subject to approval as follows: . . . (c) upon written approval of the jurisdiction with local land use authority, the County of San Mateo (*only with respect to impacts on Conserved Habitat*)

. . . ." (Italics added.) Section IX.B further provides "[a]mendments in planned Administrative Parcels may be approved only at three calendar year intervals." The grading of the additional 25 acres is in a planned administrative parcel. The most important language of section IX.B in regard to this issue provides: "Notwithstanding the foregoing, proposed amendments in the provisions of Volume II with respect to: (i) the boundary of the Conserved Habitat or Development Area; or (ii) any conditions set forth in Chapter VII regarding any Administrative Parcel may be considered at any time until such Administrative Parcel has been planned and is the subject of a specific plan or tentative subdivision tract map approval, after which time the time limits set forth above for consideration of amendments shall apply."

The language of section IX.B which I have just quoted could be interpreted to mean that boundary changes of conserved habitat could be amended under this subsection. However, such an interpretation would render meaningless the language of section IX.A which provides that such amendments can only be made "in accordance with this Section IX(A)." The last quoted provision of section IX.B is set off as a separate paragraph and might be interpreted to mean that boundary changes under section IX.A can only be made within the time periods set out in section IX.B. However, I cannot say with any certainty that a boundary change could not be made under section IX.B. Under section IX.A there are listed four possible amendments, three of which would not have a substantial effect upon any endangered species or the habitat of any endangered species. The fourth amendment under section IX.A concerns unforeseen circumstances that may appreciably reduce the likelihood of survival of endangered species and measures that can be taken in response thereto. The four amendments under section IX.A do not have an elaborate procedure in order to have the amendments approved. Under section IX.B a public hearing must be held and a biological study prepared "demonstrating that the amendment does not conflict with the primary purpose of the HCP to provide for indefinite, long-term perpetuation of the Mission Blue, Callippe Silverspot and other Species of Concern, . . ." An amendment under section IX.B can only be approved if the jurisdiction with local land use authority, the County of San Mateo (only with respect to impacts on conserved habitat) and the United States Fish and Wildlife Service consent and a permit is obtained from the federal government. It would appear if any section should apply to boundary changes that are of the type under consideration in this case it would be section IX.B, since it provides a procedure wherein it will be determined that a proposed boundary change does not conflict with the purpose of the HCP. The only other types of amendments that section IX.B could apply to would be any change in any of the funding provisions of the HCP or any change in the obligations of any public entity under the HCP. Such amendments would hardly need a

biological study. Section IX.B would be written in a totally different manner if it was not also meant to apply to boundary changes under chapter VII of the HCP. I realize that such an interpretation is in direct conflict with the clear language of section IX.A. If section IX.B did not apply, there would be no way in which the amendment could be adopted except with the consent of all the parties to the HCP Agreement. It is possible that such was the intent at the time of the execution of the HCP Agreement. As mentioned earlier in this dissent the HCP Agreement states: "The term 'Conserved Habitat' means those portions of the San Bruno Mountain Area that are presently or hereafter are to be held in fee ownership by the County and/or the State pursuant to this Agreement as contemplated in Section IV hereinbelow." Section IV of the HCP Agreement provides that restrictions on the use of conserved habitat can only be modified by the consent of all the parties to the agreement. Because of these ambiguities in the HCP Agreement, I place no reliance on the fact that the HCP and the HCP Agreement were amended in accordance with section IX.B of the HCP Agreement.

In fact it may well be that resolution No. 156-85 is invalid in so much as it approves the amendment to the HCP and the HCP Agreement since such amendment was based on section IX.B of the HCP Agreement.

The majority states "when a city acts to implement a comprehensive system of state regulations affecting a matter of statewide concern, it is acting in an administrative capacity not subject to referendum." (Maj. opn., pp. 1375-1376.) The crux of the position of the majority is then stated as follows: "As a corollary to the above rule, where a local governing body implements federal policy pursuant to a comprehensive plan of federal regulations governing matters of national concern, its actions are administrative and not subject to local referendum. This rule is consistent with the principle of federal preemption: state law is nullified to the extent it stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." (Maj. opn., p. 1376.) I am of the opinion that the majority statement of the law of this issue is too broad in that it encompasses too many actions of local governments as administrative. A better statement of the rule was stated in *Hughes* v. *City of Lincoln* (1965) 232 Cal.App.2d 741, 745 [43 Cal.Rptr. 306], as follows: "If the subject is one of statewide concern in which the Legislature has delegated decision-making power, not to the local electors, but to the local council or board as the state's designated agent for local implementation of state policy, the action receives an 'administrative' characterization, hence is outside the scope of the initiative and referendum." (See also *Yost* v. *Thomas* (1984) 36 Cal.3d 561, 570 [205 Cal.Rptr. 801, 685 P.2d 1152].)

In *Yost* the court recognized that the state could attempt to deal with an issue of statewide concern through state laws, "[h]owever, state regulation

of a matter does not necessarily preempt the power of local voters to act through initiative and/or referendum [citations]." (*Id.,* at p. 571.) "On the other hand, the matter may be one of local rather than statewide concern. In that case a local decision which is intrinsically legislative retains that character even in the presence of a state law authorizing or setting limits on the particular field of action." (*Hughes* v. *City of Lincoln, supra,* 232 Cal.App.2d at p. 745.) The court in *Yost* stated the determination whether an action of a local agency on a matter in which there has been state regulation is legislative or administrative, is based on "whether the Legislature intended to preempt local planning authority and thereby preempt the power of the voters to act through referendum." (*Yost* v. *Thomas, supra,* 36 Cal.3d at p. 571.)

The facts and issues considered in *Yost* are very similar to the facts and issues presented in the instant case. The issue in *Yost* is whether "the California Coastal Act (Coastal Act) [citation] precludes a referendum on any local land use measure affecting the coastal zone which is adopted by a city council after the California Coastal Commission (Commission) has approved the city's land use plan." (*Yost* v. *Thomas, supra,* 36 Cal.3d at 564.) The court in *Yost* stated that the Coastal Act of 1976 (Coastal Act or Act) was enacted by the Legislature as a comprehensive scheme to govern land use planning for the entire coastal zone of California. The court in *Yost* quoted portions of the Act wherein the Legislature found that the coastal zone was a valuable natural resource and that protection of the coastal zone was a matter of " 'paramount concern.' " (*Id.,* at p. 565.) The court further quoted from the Act that future developments of the coastal zone consistent with the Act " 'are essential to the economic and social well-being of the people of this state . . . .' " (*Ibid.*) Thus, it is clear that the Coastal Act was considered by the Legislature to concern a matter of statewide importance, a determination that is not disputed by the court in *Yost.* (*Id.,* at p. 571.)

The court in *Yost* proceeded to outline many of the provisions of the Act that were adopted to insure that the purposes of the Act were fulfilled. All local governments lying in whole or in part within the coastal zone had to prepare and submit to the Commission a local coastal plan (LCP). The LCP consists of a local government's land use plans, zoning ordinances, zoning district maps and other implementing actions. The Act sets forth the specific policies which constitute the standards by which the adequacy of the LCP are to be determined. The contents of the LCP is determined by the local government with consultation with the Commission. The LCP may be submitted to the Commission all at once or in two phases—a land use plan (LUP) and zoning ordinances, etc. The Commission must certify the LCP or LUP. A certified LCP and all implementing ordinances may be amended

by a local government, but no such amendment shall take effect until it has been certified by the Commission. (*Yost* v. *Thomas, supra,* 36 Cal.3d at pp. 566-567.)

The City of Santa Barbara in accordance with the Act adopted a LUP which was certified by the Commission. (*Yost, supra,* at p. 567.) The LUP set out the policies relevant to a parcel of land known as the Southern Pacific (SP) property. Thereafter respondent proposed a hotel and conference center development be built on the SP property. The City of Santa Barbara approved the development with the passage of two resolutions and one ordinance which amended the city's general plan, adopted a specific plan of development and changed the zoning of the SP property. Appellants, voters of the City of Santa Barbara, circulated a referendum petition in opposition to the two resolutions and one ordinance. Respondent Thomas, the city clerk, refused to process the petition on advice of the city attorney that the three actions of the city council were not subject to referendum. Appellants filed a petition for writ of mandate in the superior court which was denied on the ground "that the three actions were not subject to referendum because the city council was acting administratively to implement a land use plan approved by the Commission." (*Id.,* at p. 565.) The California Supreme Court disagreed and reversed the judgment and stated as an introductory comment: "Although certain actions of a city council may be characterized as 'administrative' and therefore not subject to referendum, not all land use decisions made after a coastal plan has been adopted and approved by the Commission fall into that category. The Coastal Act does not provide blanket immunity from the voters' referendum power." (*Ibid.*)

The California Supreme Court held that absent the Coastal Act the three actions taken by the city council are clearly legislative. The adoption of a general plan is a legislative act and an amendment of a legislative act is itself a legislative act. The rezoning of land is a legislative act as is the adoption of a specific plan. (*Yost* v. *Thomas, supra,* at p. 570.) The California Supreme Court recognized that the Act set forth a statement of policies which are binding on local and state agencies in planning further development in the coastal zone; and that the Act is an attempt to deal with coastal land use on a statewide basis; and that the state may preempt local regulation of matters of general statewide concern. However, the court stated that these factors do not necessarily preempt the power of local voters to act through referendum. "The question, therefore, is whether the Legislature intended to preempt local planning authority and thereby preempt the power of the voters to act through referendum." (*Id.,* at p. 571.) The court in concluding that the Legislature did not intend to preempt local planning authority, considered the fact that the local government was to determine the precise content of each local coastal plan in full consultation with the Commission.

But the Commission could only determine whether the land use program does or does not conform with the policies of the Act, but it cannot draft any part of the coastal plan. Furthermore, under the Act the local government can decide to be more restrictive with respect to any parcel of land, provided such restrictions do not conflict with the act. The court concluded: "The act, therefore, leaves wide discretion to a local government not only to determine the contents of its land use plans, but to choose how to implement these plans. Under such circumstances a city is acting legislatively and its actions are subject to the normal referendum procedure." (*Id.*, at p. 573.)

The HCP Agreement was signed by the State of California (acting by and through the Cal. Dept. of Fish and Game) and by the State of California (acting by and through the Dept. of Parks and Recreation) as well as the local government entities and the developers. One of the purposes of the Endangered Species Act is to encourage states and other interested parties to develop and maintain conservation plans. (16 U.S.C. § 1531(a)(5).) The Endangered Species Act further provides that the "Secretary may enter into agreements with any State for the administration and management of any area established for the conservation of endangered species or threatened species." (16 U.S.C. § 1535(b).) The HCP Agreement was also signed by the United States Fish and Wildlife Service. "The Director, U.S. Fish and Wildlife Service is frequently the authorized representative of the Secretary of the Interior, as also may be a regional director or an officer in charge of a Service field installation." (50 C.F.R. § 1.2.) Although the HCP Agreement appears to meet the requirements of 16 U.S.C. section 1535(b), to effectuate the HCP Agreement it was necessary to obtain a permit under 16 U.S.C. section 1539. Under this section of the Endangered Species Act the service may issue a permit to an applicant to engage in an otherwise prohibited taking of an endangered species under certain circumstances. First the applicant must submit a comprehensive conservation plan. The service then must scrutinize the plan and find in order to issue a permit, after affording opportunity for public comment, that (1) the proposed taking of an endangered species will be incidental to an otherwise lawful activity; (2) the permit applicant will minimize and mitigate the impacts of the taking "to the maximum extent practicable"; (3) the applicant has assured adequate funding for its conservation plan; and (4) the taking will not appreciably reduce the likelihood of the survival of the species. (16 U.S.C. § 1539(a)(2)(B).)

The permit was issued on the following conditions: (1) "All aspects of the 'Agreement with Respect to the San Bruno Mountain Area Habitat Conservation Plan' must be complied with and completely implemented"; and (2) "This permit is being issued based on the Service's explicit understanding, and on the condition, that Section VIII(B)(3)(b)(i) of the [HCP Agreement]

is interpreted so that this permit can be revoked or terminated if (in addition to the other requirements of that paragraph), the Service determines that the cumulative loss of Conserved Habitat in a given Administrative Parcel from all violations is greater than 5% of the total Conserved Habitat shown for that Administrative Parcel in Chapter VII of the [HCP]." Under section 1539 the "permit shall contain such terms and conditions as the Secretary deems necessary or appropriate to carry out the purposes of this paragraph, . . ." If an applicant wishes to amend his permit, he must follow the procedure for the original issuance of the permit. (50 C.F.R. § 13.23.)

I feel that this case is similar to *Yost*. The Endangered Species Act did not intend to preempt local planning authority. The local governmental agency prepares the conservation plan. The secretary may require the conservation plan to specify "such other measures that the Secretary may require as being necessary or appropriate for purposes of the plan." (16 U.S.C. § 1539(a)(2)(A)(iv).) This does not change the fact that the applicant is the one who prepares the complete conservation plan even though the applicant may be required to include in his plan additional measures that the secretary may require as being necessary or appropriate for the purposes of the plan.

The only difference in the instant case from *Yost* is that the secretary may issue the permit based on certain conditions, where the commission in *Yost* could only determine whether the land use program does or does not conform with the policies of the Act, but it cannot draft any part of the coastal plan. I feel that this case is still governed by *Yost*. In *Yost* the land use program still must conform with the policies of the Act and in the instant case the only conditions the secretary may impose on the issuance of a permit are those that are necessary to carry out the four requirements for the issuance of a permit as set out above as included in section 1539(a)(2). The Commission under the Coastal Act could in fact not certify a land use program until it contained the provisions the Commission desired. The local coastal plan is prepared by the local government entity with consultation with the Commission. Thus, in *Yost* and in the instant case the local entity determines the contents of its plan for land use within the policies of each act. The Endangered Species Act also permits the local government to be more restrictive with respect to any parcel of land, provided such restrictions do not conflict with the Act. (16 U.S.C. § 1535(f).) Therefore the Endangered Species Act as well as the Coastal Act leaves wide discretion to a local government to determine the manner in which it will carry out the policies of the acts in the use of its land and how to implement these plans. Therefore, Congress did not intend to preempt local planning authority through the adoption of the Endangered Species Act, but rather sought to encourage the adoption of conservation plans by the states as well as other entities including local government entities.

In the instant case the city implemented the HCP and HCP Agreement by adopting a zoning ordinance and approved the Terrabay Specific Plan. The parties agree that these acts were legislative. However, if the Endangered Species Act had preempted local planning authority these acts would be administrative. It therefore appears that respondent has conceded that the Endangered Species Act does not preempt local planning authority and thereby preempt the power of the voters to act through referendum. Otherwise the adoption of a zoning ordinance and approval of the Terrabay Specific Plan would be regarded as administrative acts since they implemented federal policy.

The majority puts too much reliance on whether there are comprehensive plans of federal regulations governing matters of national concern in determining whether an act is legislative or administrative. As *Yost* makes clear the real issue to be determined is whether an act leaves the local government with discretion as to local planning authority. If an act does so, it does not matter whether the act is one that concerns matters of statewide or national concern and the federal or state has implemented comprehensive plans of regulations to carry out the policy of the state or federal government.

Since I have determined that the Endangered Species Act does not require the amendment to be classified as an administrative act, I still must address whether the amendment is an administrative or legislative act under state law. The majority in concluding that the amendment is an administrative act points out that "the amendment proposes only those changes which are absolutely necessary to enable the Terrabay Project to go forward and implement the HCP Agreement. The record establishes that without the additional grading and retaining walls, the Terrabay Project will not go forward, and funding critical to the implementation of the HCP will be withdrawn." (Maj. opn., p. 1378.) The importance of an amendment does not determine whether it is an administrative act or a legislative act, but it would seem that the more important the amendment the more likely it will be regarded as a legislative act.

The majority also relies on the fact that the HCP Agreement, section IX.B, contains a detailed procedure for the approval of amendments which ensure consistency with the HCP objective. The majority sets out appellant's position as follows: "In rebuttal, appellant argues that although Government Code section 65357 anticipates amendments to a general plan and therefore provides the procedure for adoption of amendments, an amendment to a general plan is nevertheless a legislative act." (Maj. opn., p. 1378.) The majority points out that an amendment to a general plan may be adopted only by the same procedure required for the adoption of the original plan. The majority then states the "Service therefore approved an administrative

procedure for necessary amendments consistent with the objectives of the HCP." (Maj. opn., p. 1378.) The majority overlooks the provision of section IX.B of the HCP Agreement which provides that an amendment under that section "will be considered an amendment to the Section 10(a) Permit, subject to any other procedural requirements of federal law or regulation which may be applicable to amendment of such a permit." As noted earlier if an applicant wishes to amend his permit, he must follow the procedure for the original issuance of the permit. (50 C.F.R § 13.23.) Therefore there is no distinction between an amendment to a general plan and an amendment to the HCP Agreement under section IX.B.

The majority recognizes that generally an amendment to a legislative act is a legislative act, but appears to state when the modification is minor it will not be considered a legislative act and cites *Fishman* v. *City of Palo Alto* (1978) 86 Cal.App.3d 506, 511 [150 Cal.Rptr. 326], as authority for this proposition. In *Fishman* the court found that the modification of development plans "did not amount to a substantial alteration" of the plans. (*Id.,* at pp. 511-512.) However, in so finding the court in *Fishman* stated: "Some changes in the development plan of a planned community district may well be legislative and subject to referendum. That determination must be made on a case-by-case basis." (*Id.,* at p. 512.)

I do not consider an amendment which permits the developer to temporarily disturb an additional 25 acres in addition to the 33 acres he could temporarily disturb to be a minor change. After the soil instability was discovered in certain areas which could result in landslide problems to the Terrabay Project, a supplemental EIR/EA and an addendum to the supplemental EIR/EA were prepared which considered 11 alternatives to deal with the soil instability. Alternative number two was selected. The final EIR/EA supplement and the addendum thereto address visual and biological impacts of the amendment. In resolution No. 154-85 the city sets forth the three significant biological impacts and the measures to be taken to mitigate these impacts; as well as the visual impact and the mitigating measures to reduce the visual impact. The significant biological impacts are (1) the temporary disturbance of approximately 24.5 additional acres; (2) an undetermined number of Mission Blue butterflies will be incidentally taken as a result of the grading incidental to landslide repair activity; and (3) the habitat of some other species of concern may be destroyed incidental to grading for landslide repairs. The significant visual impact is "[t]he landslide repair areas replaced with engineered fill will be altered to an artificial man-made appearance." One of the mitigating measures to be taken in regard to the biological impacts is to require the developer to fund habitat enhancement on an additional 30 acres which are not originally scheduled for enhancement under the HCP. These significant impacts of the amendment and measures necessary to miti-

gate said impacts further indicate that the amendment was not such a minor change as to be considered an administrative act.

The amendment to the HCP, HCP Agreement and to the permit were adopted by the city council only after considering the supplemental EIR/EA and the addendum thereto and the holding of public hearings. The following procedures would not seem consistent with a minor change having no significant effect. Furthermore, four types of amendments are considered under the HCP Agreement which do not need an amended permit. However, the amendment sought herein under section IX.B of the HCP Agreement did require an amended permit. All of the above indicate that the amendment should not be considered minor. Resolution No. 156-85 approved by the city changed the boundaries between the preserved habitat and the habitat to be graded. Since the developer was allowed to only grade 33 acres under the HCP and the HCP Agreement the addition of 25 acres to the land which could be graded is not insignificant.

In *Wheelright* v. *County of Marin* (1970) 2 Cal.3d 448, 457-458 [85 Cal.Rptr. 809, 467 P.2d 537], certiorari denied 400 U.S. 807 [27 L.Ed.2d 37, 91 S.Ct. 65], the first ordinance approved the establishment of a planned community and the second ordinance allowed the construction of an access road to the planned community. The court in *Wheelright* held the second ordinance was a legislative act subject to the referendum. "Roadways are of sufficient public interest and concern to weight the scales in favor of construing this ordinance as being legislative and to be well within the referendum powers reserved by the people." (*Id.,* at p. 458.)

I feel that the resolution in the instant case is substantial and might even be said to be tantamount to a rezoning of the mountain. Local governments in California regulate the use of land through the adoption of zones, and only certain uses are allowed inside of a particular zone. For example, industrial uses are generally not allowed inside residential zones. Cities can change the boundaries of zones. The enactment of a measure which zones or rezones is a legislative act. (*Arnel Development Co.* v. *City of Costa Mesa* (1980) 28 Cal.3d 511, 516 [169 Cal.Rptr. 904, 620 P.2d 565].) The HCP and the HCP Agreement establish land uses in certain areas, and the boundaries dividing those areas are clearly defined. Resolution No. 156-85 approved by the city changed the boundaries between the preserved habitat and the habitat to be graded.[1] It excluded 25 acres from the preserved habitat. That change is anal-

---

[1] The majority overlooks the fact that the zoning ordinance for the Terrabay Project must also be amended. The zoning ordinance adopted for the Terrabay Project provides: "All grading plans and operations in the Terrabay Specific Plan District shall be in compliance with the provisions of the [HCP]." When the HCP was amended to provide for additional grading the zoning ordinance needed to reflect that all grading could be done in compliance with the HCP, the HCP Agreement and the amendment.

ogous to a zoning change, since it changed the use of the land from land which was to be preserved in its natural state to land which could be graded. The constitutional power of referendum (Cal. Const., art. II, § 9, art. IV, § 1) is to be liberally construed to uphold the power whenever it is reasonable to do so. (*Merriman* v. *Board of Supervisors* (1983) 138 Cal.App.3d 889, 891 [188 Cal.Rptr. 343]; *Reagan* v. *City of Sausalito* (1962) 210 Cal.App.2d 618, 628 [26 Cal.Rptr. 775].) As stated earlier, the amendment of a legislative act is also considered a legislative act. There is no dispute that the adoption of the HCP and the HCP Agreement were legislative acts. Since the amendment sought is not minor but requires the parties to the amendment to obtain an amendment to the permit issued under the Endangered Species Act, and changes the ways of accomplishing the policies and objectives of the HCP and HCP Agreement, the resolution adopting the amendment is subject to the referendum.[2]

I would reverse the judgment.

A petition for a rehearing was denied April 29, 1987, and appellant's petition for review by the Supreme Court was denied June 25, 1987. Mosk, J., and Arguelles, J., are of the opinion that the petition should be granted.

---

[2]The majority begins its discussion with the statement that "Legislative acts of a city which establish general policies and objectives, and the ways and means of accomplishing them, are subject to the referendum process." (Maj. opn., p. 1374.)